Argued and submitted November 29, 1993, reversed and remanded for further proceedings March 30, petition for review denied May 31, 1994 (319 Or 150)

Kimberly PENUEL,
Kellie Penuel, Jeff Penuel and Lois Radford,
Trustees, UA March 21, 1983
for Beneficiary Kellie Penuel,
*Appellants,*

*v.*

TITAN/VALUE EQUITIES GROUP, INC.,
and Ronald R. Linn,
*Respondents.*

(9204-02378; CA A79009)

872 P2d 28

David W. Harper and Douglas S. Chiapuzio argued the cause ánd filed the briefs for appellants.

Peter R. Mersereau argued the cause for respondent. With him on the brief was Rankin Mersereau & Shannon.

Before Deits, Presiding Judge, and Riggs, Judge, and Buttler,* Senior Judge.

BUTTLER, S. J.

---

* Buttler, S. J., *vice* Durham, J.

## BUTTLER, S. J.

Plaintiffs appeal from a judgment entered for defendants after the trial court granted defendants' motion for summary judgment on the grounds that the facts do not support a claim under ORICO, and because, even if they do, this action was not commenced within the five-year statute of limitations applicable to such claims.[1] We consider the latter claim first. On review of summary judgment, we state the facts that were before the trial court in the light most favorable to plaintiffs. *Seeborg v. General Motors Corporation*, 284 Or 695, 588 P2d 1100 (1978).

The father of plaintiffs Kimberly Penuel (then 18) and Kellie Penuel (then 15) died in early 1983, leaving two insurance policies on his life, each in the face amount of $45,000. Both daughters were equal beneficiaries under each policy. After paying off policy loans, funeral and some living expenses, each daughter received $39,000.

Shortly after the father's death, plaintiff Lois Radford (now Cimmiyotti), mother of Kimberly and Kellie, and decedent's brother, plaintiff Jeff Penuel, met with defendant Linn, who was the insurance agent who had sold the life insurance policies, to arrange for the payment of the insurance proceeds. After concluding those arrangements, Linn, who was also a licensed broker-dealer with defendant Titan/Value Equities Group, Inc., and was authorized to sell securities, determined that neither Lois nor Jeff had had experience with investments and had no investment plan for the two girls. He then suggested that he handle the investment of the insurance proceeds. They told him to go ahead. Linn said that it would be necessary to establish a trust, because Kellie was a minor, and that he knew an attorney who could prepare one for both girls. Although Kimberly was an adult and could have taken her share of the insurance proceeds ($39,000) immediately, she acquiesced in the trust arrangement as being in the best interest of the family.

---

[1] Defendants' motion appears to be one for summary judgment with respect to the statute of limitations and a motion to dismiss the ORICO claim for failure to state sufficient facts on which relief may be granted. However, the parties and the trial court treated both parts of the motion as being under ORCP 47. The parties treat it the same way on appeal and rely on depositions and affidavits to support their positions. Accordingly, we treat the entire motion as one for summary judgment.

A few days later, Linn picked up Kimberly and Lois and took them to Jeff's house where he explained his investment plan. They would establish a trust under which each of the girls would be equal beneficiaries and Lois and Jeff would be co-trustees. The trust would be irrevocable until each of the girls attained the age of 25. Lois would be appointed guardian of Kellie and would transfer Kellie's funds to the trustees; Kimberly would also transfer her insurance proceeds to the trustees. The trustees would then invest $28,000 in a money market fund and $10,000 in each of five limited partnerships. All of the documents had been prepared, and were then signed by Lois and Kimberly.

Later that day, Linn met with Jeff and explained the investment plan to him. Jeff then signed all of the documents presented to him. Neither Lois nor Jeff knew anything about limited partnerships, and Linn did not explain them or explain the suitability requirements for investing in them. He did not tell them that he only sold interests in limited partnerships or explain other investments such as stocks and bonds. He did not say that his commission for the sale of limited partnership interests was 8 percent, about twice what a broker would charge for the sale of stocks or bonds. Both Lois and Jeff told Linn that they wanted the money to be put into low risk investments with growth potential and wanted to be able to get money out if it became necessary. Linn assured them that the limited partnerships were sound investments with little risk and that they could get money out when they wanted, although it might take a little longer than it would with the money market fund. He also represented to them that by the time Kellie became 25, all of the limited partnership interests would be worth at least $200,000 if Kimberly did not withdraw her share of the trust before that time. Both of them trusted Linn, considered him to be an expert and relied on his recommendations as to the vehicle to be used and on the investments that he recommended.

Following Linn's recommendations, the trustees invested $28,000 in a money market fund and, by purchase orders dated April 14, 1983, invested $10,000 in each of five limited partnerships, four of which are the subject of this lawsuit: Damson Oil, H.C.H. Oil, McCombs Properties and National Properties. The suitability requirements for two of

them required that the investor have a net worth of $90,000; the other two required a net worth of $75,000. Although the Client Data form filled out by Linn, and required to be maintained by him, was signed by the trustees and indicated that the trust had a net worth of $95,000,[2] neither of the trustees recalls seeing that figure on any form or that any such figure was mentioned by Linn at any time. Neither of the girls, individually, could have qualified for any of those investments. It is apparent that Linn persuaded Kimberly to put her insurance proceeds into the trust along with Kellie in order to say that there was one purchaser with sufficient net worth to justify the sale of the limited partnership interests. However, it is also apparent that, even by doing so, he grossly overstated their combined net worth, which was approximately $78,000. At best, the trust might have qualified for two of the limited partnership investments.

In February, 1986, the trustees received a letter from Damson Oil stating that the dividend distribution had been reduced as a result of debt restructuring, failure of a natural gas contract and declining oil prices. Jeff talked to Linn about this and was told that everything was fine, that it was normal business, and that the trustees should not sell it. In April, 1986, H.C.W. Oil informed the trustees that oil prices had declined more than 50 percent and that the decline had caused a major contract failure for the partnership. In March, 1987, Jeff received a notice from McCombs Properties that it was filing for protection under Chapter 11 of the Bankruptcy Act. He thought that the partnership would be stronger after the reorganization. He stated in an affidavit that, although he knew that some of the "investments were reorganizing," Linn kept telling him that they would be all right.

Nevertheless, in May, 1987, the trustees moved their account from Linn's office to another investment firm, because the family thought that they could "get better service." Sometime after the account had been moved to the new firm, plaintiffs learned that there was little, if any, value in the four limited partnerships in question, and that their money could not be recovered. This action was filed on April 8,

---

[2] Defendants now concede that that figure is wrong, and say that it should be $90,000, apparently on the theory that the face amount of each of the two insurance policies was $45,000. The net amount, however, was $78,000.

1992, alleging claims under the securities law and under ORICO. After defendants filed a motion for summary judgment, which raised the statute of limitations defense, plaintiffs filed an amended complaint, alleging only the ORICO claim. Defendants then filed a new motion for summary judgment, which the trial court granted on both grounds asserted: The statute of limitations had expired and the facts did not support a claim under ORICO.

■■ The statute of limitations for civil actions brought under ORICO is five years. ORS 166.725(11). All of the investments were made on April 14, 1983, and this action was commenced on April 8, 1992, almost nine years after the alleged wrongful conduct. Plaintiffs' cause of action accrued when they discovered or, in the exercise of reasonable diligence, should have discovered that they had been damaged and the cause of the damage. *Jaquith v. Ferris*, 297 Or 783, 687 P2d 1083 (1984); *U.S. Nat'l Bank v. Davies*, 274 Or 663, 548 P2d 966 (1976); *Gaston v. Parsons*, 117 Or App 555, 844 P2d 941 (1993), *aff'd on other grounds* 318 Or 247, 864 P2d 1319 (1994). Plaintiffs had reason to believe that they might have been damaged in February, 1986, when they were advised by Damson Oil that the dividend distribution had been reduced; however, they asked Linn about the situation and were assured that everything was fine and that they should not sell it. The same is true with respect to the apparently unfavorable reports that the trustees received from two of the other limited partnerships. They discussed the situation with Linn, who stated that everything would be all right.

None of the plaintiffs had had any experience with investments, and Linn knew that from the beginning; that is why he suggested that he develop a plan for them. Linn was their expert on whom they relied completely. It was not until May, 1987, that plaintiffs decided that it was in their best interest to turn the investment account over to another investment advisor. Sometime thereafter, they learned of the seriousness of their economic situation, but even then did not learn of defendants' violation of the securities laws and ORICO.

Plaintiffs contend that, in advising them that there were no problems every time an apparently adverse report

was received from one of the limited partnerships, Linn lulled them into a false sense of security and that he was concealing information from them. In response, defendants argue that plaintiffs must have known from the reports that they had received that, contrary to the earlier representations that plaintiffs attribute to Linn, the investments were risky and were not liquid as early as February, 1986, when they were advised by Damson Oil of the decrease of its dividend, but, in any event, no later than March, 1987, when McCombs Properties notified them that it was filing for protection under Chapter 11 of the Bankruptcy Act. However, if it should have been so apparent to plaintiffs, who had had no experience with investments, it should have been even more apparent to Linn, who was an avowed expert in whom plaintiffs had complete trust and confidence, and who should have advised them of their situation honestly and accurately. Linn could have, at the least, advised plaintiffs of the then current value of the limited partnerships, instead of telling them that there was no reason to worry. Because a jury could find that Linn lulled plaintiffs into a false sense of security and concealed information from them, defendants cannot rely on the statute of limitations. To permit them to do so would be to permit them to take advantage of their own wrong. *Chaney v. Fields Chevrolet*, 264 Or 21, 503 P2d 1239 (1972).

We conclude that there is a genuine issue of material fact as to whether, under all of the circumstances, plaintiffs made reasonable inquiry to the person whom they reasonably believed was in the best position to know what the situation was, and whether that person lulled them into a false sense of security and concealed material facts from them to prevent them from discovering that they might have a cause of action against him. Therefore, there is a genuine issue of material fact as to whether the statute of limitations had run before plaintiffs commenced their action, and it was error to grant defendants' motion for summary judgment on that ground.

If the fact finder were to find that plaintiffs filed their action within five years after their cause of action accrued, the question remains whether the record on summary judgment supports plaintiffs' claim under ORICO. ORS 166.715-ORS 166.735. There is no dispute as to whether they have alleged, and shown on summary judgment, conduct which, if believed,

would constitute a crime under ORS chapter 59 (relating to securities), thereby coming within the general definition of ORS 166.715(6) (1991):

"(6)   'Racketeering activity' means to commit * * *

"(a)   Any conduct which constitutes a crime, as defined in ORS 161.515, under any of the following provisions of the Oregon Revised Statutes:

"(A)   ORS chapter 59, relating to securities;

"* * * * *

"(b)   Any conduct defined as 'racketeering activity' under 18 U.S.C. 1961 (1)(B), (C) and (D)."

18 USC § 1961(1)(D) includes:

"Any offense involving * * * fraud in the sale of securities * * *."

In addition, ORS 59.991(1) provides that the violation of any rule adopted by the director under chapter 59 is a Class B felony. *Former* OAR 441-205-155 (*repealed* in 1994) provides that it is a fraudulent act or practice for any broker-dealer to recommend to a customer the purchase of any security unless he shall have reasonable grounds to believe that the recommendation is suitable to the customer on the basis of information furnished by the customer after reasonable inquiry concerning the customer's investment objectives, financial situation and need and any other information known by the broker.

The Securities Act of 1933 makes it a crime for any person to wilfully violate any rule thereunder, or, in any report or document required to be filed thereunder, to make any untrue statement of material fact or to omit to state any material fact required to be stated therein. 15 USC § 77yyy. The Securities Exchange Act of 1934 makes it a crime for a person to wilfully or knowingly make, or cause to be made, any statement in any report or document required to be filed by any self-regulating organization which is false or misleading with respect to any material fact. 15 USC § 78ff. The National Association of Securities Dealers (NASD) is the self-regulating organization for securities brokers. Its rules require broker-dealers to maintain files disclosing the basis for determining financial suitability in the sale of Direct

Participation Programs. The limited partnerships Linn sold to the trustees were in that category.

Notwithstanding that defendants' activity could constitute a crime under the securities laws, that is not sufficient by itself to come within ORICO. There is the added requirement that there be a "pattern of racketeering activity." ORS 166.715(4) provides:

> " 'Pattern of racketeering activity' means engaging in at least two incidents of racketeering activity that have the same or similar intents, results, accomplices, victims or methods of commission or otherwise are interrelated by distinguishing characteristics, including a nexus to the same enterprise, and are not isolated incidents, provided at least one of such incidents occurred after November 1, 1981, and that the last of such incidents occurred within five years after a prior incident of racketeering activity."

A jury could find that defendants, in order to attempt to justify the sale of the five limited partnership interests to the two girls and to receive commissions of 8 percent to 8-1/2 percent, Linn: (1) devised a scheme to establish a trust for the benefit of the two girls, thereby pooling their insurance proceeds, their only assets; (2) hired an attorney to prepare the trust documents; (3) did not explain the suitability requirements to any of the plaintiffs for investing in those securities; (4) told plaintiffs that those investments were not risky and that they could get their money out in a short time; and (5) caused a false Client Account Data form to be filled out and signed, and represented the trust as having a net worth of $95,000, when, in fact, the combined net assets of the two girls was only $78,000. Although the combined net assets might have justified selling two of the limited partnership interests to the trustees, there was no justification for selling them the other two, which required the investor to have net assets of $90,000.

Because a jury could find that three of the acts described above (3, 4, and 5) constituted violations of the securities laws, state and/or federal, there were at least two incidents of racketeering as defined in ORS 166.715(6). The question remains whether plaintiffs have shown a "pattern of racketeering activity," as defined in subsection (4) of that section. A pattern exists if there are

"at least two incidents of racketeering activity that have the same or similar intents, results, * * * victims or methods of commission or otherwise are interrelated by distinguishing characteristics, including a nexus to the same enterprise, and are not isolated incidents * * *." ORS 166.715(6).

The concept of an "enterprise" in ORICO is somewhat amorphous. ORS 166.715(2) provides, in part:

" 'Enterprise' includes any individual, * * * corporation, * * * or other profit or nonprofit legal entity, and * * * both illicit and licit enterprises * * *."

ORS 166.720, which makes racketeering activity unlawful and is the predicate for maintaining a civil action under ORS 166.725(7), provides in subsection (3):

"It is unlawful for any person employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity * * *."

ORICO is patterned after the federal RICO, and federal court decisions are useful guidance in interpreting ORICO. In *National Organization for Women, Inc. et al. v. Scheidler et al.*, 510 US ____, 114 S Ct 798, 127 L Ed 2d 99 (1994), the Supreme Court interpreted the RICO equivalent of ORS 166.720(3). It said that "enterprise" as used in that subsection "connotes generally the vehicle through which the unlawful pattern of racketeering activity is committed * * *." 510 US at ____, 127 L Ed 2d at 109.

Here, the enterprise was comprised of an individual and a corporation engaged in the sale of securities. The enterprise caused the pooling of the girls' assets into one trust in an attempt to justify the sale of securities that were clearly unsuitable for the girls separately, and at least two of them were not suitable for the trust after their assets were combined in the trust. In carrying out its plan, the enterprise engaged in the "incidents of racketeering" discussed above, each of which had the same intents, results and victims, and each had a nexus to the enterprise.

Therefore, there were "at least two incidents of racketeering activity" within the meaning of ORS 166.715(4), unless they were "isolated incidents" within the meaning of that subsection. All of the incidents took place

within a very short time, and all of the sales were consummated within a few minutes on the same day; therefore, in common parlance, they might appear to have been "isolated incidents." However, the Supreme Court in *Computer Concepts, Inc. v. Brandt*, 310 Or 706, 801 P2d 800 (1990), held that that phrase describes the relationship between or among the predicate acts, including their relationship to the same enterprise; it does not have a temporal element. Accordingly, we conclude that the incidents of racketeering activity were not "isolated incidents" within the meaning of ORS 166.715(4).

Given our conclusions as to what the record on summary judgment would permit a jury to find, we hold that it was also error to grant defendants' motion for summary judgment on the ground that there is no genuine issue of material fact with respect to plaintiffs' claim under ORICO.

Reversed and remanded for further proceedings.