The **RESOLUTION TRUST CORPORATION,** a federal corporation, in its corporate capacity, Plaintiff,

v.

**Kenneth H. SMITH, Richard Hoffman, Robert Dene Bateman, William H. Dalton, Jack C. Darley, Stanley N. Hammer, and Robert B. Lorence, Defendants.**

**Civ. No. 93–1112–FR.**

United States District Court,
D. Oregon.

Jan. 11, 1995.

As Amended March 2, 1995.*

---

* Text of the March 2, 1995 opinion will be published separately in a later volume. See 1995 WL 94697.

William R. Turnbow, Hershner, Hunter, Moulton, Andrews & Neill, Eugene, OR, Ernest Warren, Jr., Walker and Warren, Portland, OR, Neysa L. Day, Sr. Atty., Resolution Trust Corp., Professional Liability Section, Overland Park, KS, for plaintiff.

E. Joseph Dean, Steven T. Lovett, Stoel Rives Boley Jones & Grey, Portland, OR, for defendants.

## OPINION

FRYE, District Judge:

The matter before the court is the motion of the defendants, Kenneth H. Smith, Richard Hoffman, Robert Dene Bateman, William H. Dalton, Jack C. Darley, Stanley N. Hammer, and Robert B. Lorence, for summary judgment (# 21).

On behalf of the Family Federal Savings & Loan Association (Family Federal), a federally-chartered "thrift" whose headquarters are located in Dallas, Oregon, the plaintiff, the Resolution Trust Corporation (the RTC), a federal corporation, alleges claims for negligence, breach of fiduciary duty, and breach of contract against the seven defendants, who are former directors and/or officers of Family Federal. On January 10, 1990, the Office of Thrift Supervision appointed the RTC as the receiver for Family Federal. The RTC, as the receiver for Family Federal, transferred any claims that Family Federal had against the seven defendants to the RTC in its corporate capacity.

## BACKGROUND

The claims of the RTC against the defendants are based upon the recommendation and/or approval by the defendants of two major investments made by Family Federal: (1) the financing of the construction of the Grand Butte Hotel [1] in Crested Butte, Colorado; and (2) the purchase of promissory notes and contracts secured by interests in a time-share vacation club.

## UNDISPUTED FACTS

In January of 1984, the Board of Directors of Family Federal consisted of defendants Kenneth H. Smith, William H. Dalton, Jack C. Darley, Stanley N. Hammer, Robert B. Lorence, and a sixth director who died in 1984. Defendant Robert Dene Bateman was elected to fill the vacancy caused by the death of the director who died in 1984. Defendant Richard Hoffman was the chief lending officer of Family Federal at all relevant times. At all relevant times, the defendants comprised a majority of the Board of Directors of Family Federal.

At its meeting in November, 1983, the Board of Directors of Family Federal approved a purchase by Family Federal of time-share loans totaling two and one-half million dollars. These time-share loans involved time-share units located in the Indian Wells Resort, which was owned by the Worldwide Group (WWG).

On or about January 24, 1984, the Board of Directors of Family Federal approved the purchase of a two million dollar participation in a thirty-one million dollar loan to finance the construction of the Grand Butte Hotel in Mt. Crested Butte, Colorado. The Board of Directors relied on an investigation conducted by the loan committee of Family Federal; the loan packet from Investment Mortgage International, Inc. (IMI), a mortgage broker; and the fact that the leading lender was State Savings and Loan Association (State Savings) of Salt Lake City, Utah, a federally-insured "thrift" subject to the regulations of the Federal Savings and Loan Insurance Corporation (FSLIC). The investigation conducted by the loan committee of Family Federal included a review of an appraisal which had been performed by a member of the Appraisal Institute, wherein the value of the project was deemed to be approximately forty-one million dollars, making a loan-to-appraised value ratio of 75%.

At a meeting of the Board of Directors in May of 1984, the officers and the members of the Board of Directors discussed the controversy concerning the owner of IMI, who also was the controlling shareholder of State Savings, which was the leading lender of the Grand Butte loan. Contributors to *The San Francisco Examiner* and *The Wall Street Journal* had accused the owner of IMI of receiving large brokerage fees by using State Savings to lure participants to loans brokered by IMI.

At the meeting of the Board of Directors in June of 1984, the officers and directors discussed the reliance of Family Federal on the appraisal provided by IMI in light of concerns that the appraiser had not discounted the value of the project for the amount of time that it would take to sell the project. The officers and directors also discussed the fact that the position of Family Federal in the Grand Butte loan would be threatened if State Savings went into receivership. At a meeting of the Board of Directors in August

---

1. The parties dispute the name of the loan obtained to finance the construction of the Grand Butte Hotel. However, both parties are referring to the same loan. In this opinion, the Grand Butte loan is the loan referred to by the defendants as the Mt. Crested Butte loan.

of 1984, the officers and directors discussed whether Family Federal's concentration of assets in time-share loans would be judged an "unsafe and unsound practice," thereby giving the regulator cause to take control of Family Federal.

The Federal Home Loan Bank Board (the FHLBB) supervised Family Federal. In its examination report of November, 1984, the FHLBB noted that the original appraisal which had been relied upon by Family Federal was not in conformance with FHLBB Memorandum R–41B, and that the original appraisal was inaccurate because the appraiser had not discounted for time. With the appropriate discount, the FHLBB estimated that the fair market value of the project was less than the amount of the loan. A second appraisal was commissioned in response to the report of the FHLBB.

In May of 1985, Family Federal agreed to fund 2.9 million dollars in the WWG Vacation Club Timeshare membership paper. The transaction with WWG had been discussed at the meetings of the Board of Directors in February and March of 1985.

By June of 1985, the following facts concerning the Grand Butte loan were known to and had been discussed by the officers and directors of Family Federal: (1) State Savings, the leading lender of the Grand Butte loan was in receivership; (2) FSLIC, as the receiver of State Savings, had refused to fund State Savings' share of the loan; (3) an additional cash infusion of ten million dollars was required to complete the construction; (4) the developers wanted to be released from their personal guarantees in exchange for cooperating in the workout of the loan; and (5) in the second appraisal, the project was valued at 31.3 million dollars, about 25% below its then estimated cost. At meetings of the Board of Directors, the officers and directors discussed the fact that the interest of Family Federal in the loan had been threatened.

In its examination report of October of 1985, the FHLBB criticized Family Federal's involvement in the Grand Butte Hotel project because of the second appraisal, the additional cash flow needed, and the fact that four of the nine original loan participants had decided not to fund their remaining portions of the loan. The FHLBB also noted in that report that a deed had been obtained from the borrowers upon the release of the borrowers and guarantors from any liabilities arising from the original loan. All of the directors and the vice president of Family Federal, D. Lee Proctor (who was also the internal auditor, a loan committee member, and a depositor), read all of the examination reports of the FHLBB.

In March of 1986, WWG informed Family Federal that its cash flow was inadequate and that WWG was going to hold a meeting of all of WWG's creditors. At that time, Family Federal had approximately 2.6 million dollars in membership time-share loans of WWG, a high percentage of which were delinquent; WWG was threatening to file a petition in bankruptcy; and the Attorney General of the State of Illinois had threatened to freeze the assets of WWG. At the meeting of the Board of Directors of Family Federal in March of 1986, the officers and directors discussed the financial condition of WWG and the value, if any, of the time-share club memberships. In a special examination report of April 14, 1986, the FHLBB criticized the lending activities of Family Federal with respect to the WWG time-share loans.

In August of 1986, the FHLBB informed Family Federal that it had grounds for initiating "cease-and-desist" proceedings against Family Federal. The FHLBB stated as follows:

> FHLBB is of the opinion that [Family Federal] has violated certain of the laws, rules or regulations to which [it] is subject and/or has engaged in certain unsafe or unsound practices in conducting the business of [Family Federal], and that such violations and/or practices provide grounds for the initiation of cease-and-desist proceedings against [Family Federal] by the FHLBB....

Exhibit D to Declaration of Kenneth H. Smith, p. 1.

Thereafter, Family Federal entered into a Supervisory Agreement with the FHLBB in which Family Federal agreed that its Board of Directors would make regular reports to

**810**

the FHLBB regarding the financial status of Family Federal, and the FHLBB would decide the amount of acceptable loss reserves on the basis of its estimated value of the Grand Butte loan. The President's Reports of Family Federal for the years 1986 and 1987, which were issued to all of the depositors who attended the annual meetings, disclosed the creation of the loss reserve. All officers and directors of Family Federal were aware of the creation of the loss reserve. The President's Reports also disclosed that substantial additional loss reserves had been established in the previous year.

· At the annual meeting in March of 1986, President Smith described the unfavorable developments with regard to the Grand Butte loan. He described the anticipated losses to Family Federal from those loans. By November of 1986, more than 73% of Family Federal's loss reserves for substandard loans were attributable to the Grand Butte loan and the time-share loans. The loss reserve for the Grand Butte loan was $561,118, and the loss reserve for the time-share loans was $446,891. By December of 1986, about 375 of the time-share loans were delinquent more than 90 days ($821,989 was delinquent out of a total principle balance of $2,212,105).

At the meeting of the Board of Directors in January of 1987, the officers and directors discussed the possibility that Family Federal would not meet its minimum net worth requirements at the end of 1986. President Smith reported to the supervisory agent for the FHLBB in Seattle, Washington that the Grand Butte loan and the time-share loans had devastated Family Federal's projections for improved earnings. At the annual meeting in March of 1987, President Smith discussed the unfavorable developments with regard to both the Grand Butte loan and the time-share loans. At both meetings, he described the anticipated losses to Family Federal from those loans.

· By April of 1987, the unsecured creditors of WWG had filed a Chapter 7 petition in bankruptcy. At a meeting of the Board of Directors on April 28, 1987, the participants in the Grand Butte loan discussed suing the first appraiser. Their attorney represented that it was possible that they had claims against the appraiser. At the meeting of the Board of Directors in June of 1987, a representative of the FHLBB told the officers and directors that Family Federal needed a much more stabilized position to meet its net worth requirements, and that a representative of the FHLBB would be attending most of the meetings of the Board of Directors of Family Federal.

The FHLBB representative noted in his summary report in July of 1987 that Family Federal had not established an effective internal review program with regard to the value that the FHLBB assigned to its assets, and that the Grand Butte loan and the time-share loans were the primary causes of the drain on the operating income of Family Federal. The criticisms of the FHLBB representative were discussed at the meeting of the Board of Directors in November of 1987.

The depositors of Family Federal had the right to vote for the directors of the FHLBB, to attend the annual meetings of the FHLBB, and to receive a year-end, pro rata distribution of profits of the FHLBB.

Family Federal did not have a written contract with any of its officers or directors. However, the officers and directors of Family Federal knew that they were bound by whatever duties and obligations the law imposed upon officers and directors of a federally-chartered savings and loan association. The officers and directors of Family Federal did not have conversations or other communications with any representative of Family Federal concerning the specific contractual duties of the officers and directors of Family Federal. No officer or director stood to gain personally in any way by recommending or approving any loan that Family Federal made during the relevant time period, including the loans that are the subject of this action.

**CONTENTIONS OF THE PARTIES**

The defendants contend that they are entitled to judgment as a matter of law on the claims of the RTC for negligence, breach of fiduciary duty, and breach of contract because those claims are time-barred. The

defendants argue that the facts giving rise to the claims of the RTC occurred from four and one-half to more than six years before the RTC was appointed receiver of Family Federal in January of 1990.

The defendants contend that the knowledge of each officer and director of Family Federal concerning the loans at issue is imputed to Family Federal, RTC's predecessor in interest. Alternatively, the defendants argue that Family Federal's depositors knew or should have known, at least by 1987, of the conduct of the defendants which underlies the RTC's claims. Memorandum in Support of Defendants' Motion for Summary Judgment, p. 7.

The defendants further contend that they are entitled to judgment as a matter of law on the claim of the RTC for breach of contract because there were no written or oral contracts between the defendants and Family Federal. Additionally, the defendants argue that the RTC may not maintain a claim for breach of contract on the basis of a breach of the standard of due care. The defendants argue that by alleging a claim for breach of contract based upon the same facts as its claim for negligence, the RTC is trying to gain the advantage of the six-year statute of limitations applicable to contract claims, as opposed to the two-year statute of limitations applicable to tort claims. The defendants argue that the claims of the RTC sound in tort, and therefore the applicable statute of limitations is two years.

The RTC contends that the defendants have failed to meet their burden of showing the absence of questions of material fact and their entitlement to judgment as a matter of law on the alternative state law claims of the RTC because material issues of fact exist regarding when those claims accrued. Relying on *Gaston v. Parsons*, 318 Or. 247, 864 P.2d 1319 (1994), the RTC contends that its state law claims did not accrue until Family Federal knew or reasonably should have known that there was a substantial likelihood that: (1) it had suffered harm; (2) the conduct of the defendants had caused that harm;

and (3) the conduct of the defendants was tortious, i.e. it invaded one or more of Family Federal's legally-protected interests. According to the RTC, the defendants have failed to provide evidence establishing that Family Federal knew or reasonably should have known that the conduct of its officers and directors was tortious.[2]

The RTC contends that the evidence presented by the defendants merely shows "how various people were aware that the Grand Butte Hotel project and time-share operations had financial difficulties and that the loans in question went bad." Plaintiff's Response to Defendants' Motion for Summary Judgment, p. 3. The RTC argues that the depositors did not know and could not reasonably have known that the defendants had acted negligently or otherwise tortiously. The RTC argues that:

> (1) the obvious presence of causes other than Defendants' negligence for the problems with the loans, (2) the lack of information about exactly what investigation Defendants did and what information they based their decisions on, and (3) Defendants repeated assertions that they acted appropriately in all ways at least permits the conclusion that neither Defendants nor anyone else suspected that their own conduct was "tortious" until 1988 or later. Accordingly, there is at least a question of fact as to when the RTC's causes of action accrued under state law and Defendants' motion must be denied.

*Id.* at 4–5.

The RTC contends that the doctrine of adverse domination tolls a statute of limitations until the culpable officers and directors no longer control the corporation; that, if presented with the issue, the appellate courts of the State of Oregon would adopt the doctrine of adverse domination; and that, under the doctrine of adverse domination, courts recognize that:

> (1) corporations take major actions only through and with the approval of their board of directors, (2) corporate directors

---

**2.** The RTC also disputes whether the defendants have produced evidence establishing that Family Federal knew that the defendants had caused them harm. *See* Plaintiff's Response to Defendants' Motion for Summary Judgment, p. 3.

812

are fiduciaries, and (3) when a group of directors are potentially liable to the corporation, a conflict arises between the interests of the corporation and the personal interests of the directors.

*Id.* at 9.

The RTC argues that the Oregon Supreme Court would adopt the doctrine of adverse domination to toll the statute of limitations so long as the culpable officers and directors controlled Family Federal. Accordingly, the RTC argues that the motion of the defendants for summary judgment on the ground that the state law claims of the RTC are time-barred should be denied.

The RTC also argues that its federal law claims are not time-barred because the United States Court of Appeals for the Ninth Circuit would adopt the doctrine of adverse domination as an extension of the federal discovery rule. In the alternative, the RTC argues that there is a substantial question regarding whether its claims for breach of fiduciary duty and breach of contract based upon the statutorily-required oath taken by the defendants to diligently perform their duties sounds in contract or tort. Accordingly, the RTC argues that this court should apply the six-year statute of limitations applicable to actions on contracts.

Finally, the RTC contends that the defendants should be equitably estopped from asserting the defense of the statute of limitations because they concealed facts evincing a cause of action. The RTC argues that in *Chaney v. Fields Chevrolet Co.,* 264 Or. 21, 503 P.2d 1239 (1972); *Fehl v. Horst,* 256 Or. 518, 474 P.2d 525 (1970); and *Penuel v. Titan/Value Equities Group, Inc.,* 127 Or. App. 195, 872 P.2d 28, *rev. denied,* 319 Or. 150, 877 P.2d 87 (1994), the Oregon Appellate courts ruled that a fiduciary may not assert the defense of the statute of limitations when the fiduciary has concealed the material facts upon which a cause of action is based. The RTC contends that a question of material fact exists as to whether the defendants are barred from asserting the defense of the statute of limitations by their failure to fully disclose either the existence of the claims against them or the facts upon which those claims are based.

## APPLICABLE STANDARD

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The burden of establishing the absence of a material issue of fact is on the moving party. *British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 951 (9th Cir.1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). All inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

## ANALYSIS

Under the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (the FIRREA), the receiver here—the RTC—stands in the shoes of the insolvent entity—Family Federal—and any defense that is good against Family Federal is good against the RTC. *O'Melveny & Myers v. FDIC,* —— U.S. ——, ——, 114 S.Ct. 2048, 2054, 129 L.Ed.2d 67 (1994). Here, the defendants have asserted the affirmative defense of statute of limitations. The statute of limitations applicable to the FIRREA provides:

**(14) Statute of limitations for actions brought by conservator or receiver**

**(A) In general**

Notwithstanding any provision of any contract, the applicable statute of limitations with regard to any action brought by the Corporation as conservator or receiver shall be—

(i) in the case of any contract claim, the longer of—

(I) the 6–year period beginning on the date the claim accrues; or

(II) the period applicable under State law; and

(ii) in the case of any tort claim, the longer of—

(I) the 3–year period beginning on the date the claim accrues; or

(II) the period applicable under State law.

**(B) Determination of the date on which a claim accrues**

For purposes of subparagraph (A), the date on which the statute of limitation begins to run on any claim described in such subparagraph shall be the later of—

(i) the date of the appointment of the Corporation as conservator or receiver; or

(ii) the date on which the cause of action accrues.

12 U.S.C. § 1821(d)(14).

### 1. *The State Law Claims of the RTC*

■ The parties agree that the statute of limitations for claims filed under the FIR-REA does not revive stale state law claims. *See FDIC v. Dawson*, 4 F.3d 1303 (5th Cir. 1993), *cert. denied*, — U.S. —, 114 S.Ct. 2673, 129 L.Ed.2d 809 (1994). The defendants do not agree that the claims for negligence, breach of fiduciary duty, and breach of contract alleged by the RTC on behalf of Family Federal were viable under the laws of the State of Oregon on January 10, 1990, the date that the RTC was appointed receiver of Family Federal. In their memoranda to the court, the parties agree, however, that the dispositive issue is whether the claims of Family Federal accrued under the laws of the State of Oregon before January 10, 1988.

■ The State of Oregon has adopted a "discovery rule" which provides that a cause of action "accrues for statute of limitations purposes ... when the plaintiff knew or should have known facts that would make a reasonable person aware of a substantial possibility that he or she had suffered damage as the result of tortious conduct." *Gaston v.*

*Parsons, supra,* 318 Or. at 259, 864 P.2d 1319.

The defendants have offered evidence that the officers and directors of Family Federal were aware before January 10, 1988 of facts indicating a substantial possibility that the initial decision of the Board of Directors to enter into the two loan projects may have constituted tortious conduct which damaged the corporation. The depositors of Family Federal, however, knew only that the two loans at issue had financial difficulties, and that in 1986 and 1987, as a result of those loans, loss reserves amounting to almost one million dollars were created. That evidence does not establish, as a matter of law, that the depositors of Family Federal knew or could have discovered with reasonable diligence before January 10, 1988 that Family Federal had been harmed by the tortious conduct of the defendants.

■ The defendants attempt to establish the requisite knowledge on the part of Family Federal by imputing the knowledge of the officers and directors, as agents of Family Federal, to Family Federal. An agent's knowledge cannot be imputed to the principal, however, if the claim of the principal is that it was defrauded by the agent. *See* Restatement (Second) of Agency § 282(1) (1958). The knowledge of the defendants cannot as a matter of law be imputed to Family Federal for the purposes of its claims against them for negligence, breach of fiduciary duty, and breach of contract.[3]

■ A more difficult question, however, is whether the knowledge of the nonculpable officers and directors may be imputed to Family Federal for purposes of the discovery rule. This court agrees with the Supreme Court of the State of Maryland that the doctrine of adverse domination is a corollary of the discovery rule and determines the accrual of a cause of action:

> In an adverse domination situation the agent cannot reasonably be expected to act upon or communicate knowledge of his

---

**3.** The defendants contend that the adverse interest exception to the agency imputation rule does not apply here. The defendants argue that no defendant stood to gain personally from approving or recommending the loans that are the subject of this lawsuit. However, here, it would have been adverse to the interests of the officers and directors for them to disclose facts to Family Federal which evinced a cause of action against the officers and directors.

own wrongdoing to the corporation. Therefore, in most cases, corporate board members and officers control the corporation and constitute an insuperable barrier to a corporation's ability to acquire the knowledge and resources necessary to bring suit against the directors and officers.... [I]t is the "inherently unknowable" character of the injury that is the critical factor that governs the applicability of the discovery rule. The discovery rule provides that accrual takes place only when a plaintiff has notice of the existence of a cause of action. The doctrine of adverse domination presumes that actual notice will not be available until the corporate plaintiff is no longer under the control of the erring directors.

*Hecht v. RTC,* 333 Md. 324, 635 A.2d 394, 405 (1994) (citation omitted).

■■■ The doctrine of adverse domination creates a *rebuttable* presumption that the control of the entity by the culpable officers and directors precludes the entity from bringing suit against them because the officers and directors can hardly be expected to sue themselves or release information evincing a cause of action against them. However,

[t]he doctrine of adverse domination does not mandate that accrual will occur only after the wrongdoing directors have lost control of the corporation. Rather, it sets forth a presumption that differs according to which version of the doctrine is applied.

The "disinterested majority" version carries the presumption that control of the association by culpable directors and officers precludes the possibility of filing suit because these individuals can hardly be expected to sue themselves or to initiate any action contrary to their own interests. This presumption can be rebutted, however, by evidence that someone other than the wrongdoing directors had knowledge of

the cause of action, and both the ability and the motivation to bring suit....

Under the "single disinterested director" version, the burden is upon the plaintiff, who must show full, complete and exclusive control by the directors charged with wrongdoing, and must negate the possibility that an informed director or shareholder could have induced the corporation to institute suit.

*Id.* 635 A.2d at 406 (internal quotation marks and citations omitted).

■■■ The appellate courts of the State of Oregon have neither accepted nor rejected the doctrine of adverse domination. However, in light of its recent decision in *Gaston, supra,* this court concludes that, if presented with the issue, the Oregon Supreme Court would adopt the doctrine of adverse domination.[4] The court also concludes that the Oregon Supreme Court would not limit the doctrine of adverse domination to claims involving more than simple negligence because the doctrine of adverse domination is not premised on the degree of culpability of the directors; rather, it is premised on the fact that a corporation cannot protect its interests when culpable directors control the corporation and its access to information. As the court in *Hecht v. RTC, supra,* explained:

It is not only in situations involving fraud that a corporation can be prevented from learning of a potential claim against its directors and officers. It is unlikely that directors will take the affirmative step of communicating information that could raise criticism of their performance. *It is the fact of their control over information, not necessarily any fraudulent activity, that makes the doctrine necessary:* ...

635 A.2d at 408 (emphasis added).

■■■ The court also concludes that the "disinterested majority" version of the doctrine of adverse domination is more conso-

---

4. The defendants argue that the Oregon appellate courts would not adopt the doctrine of adverse domination because the Oregon courts have consistently *declined* to adopt a judicial doctrine to toll a statute of limitations. However, the doctrine of adverse domination, as a corollary of the discovery rule, determines the time of accrual of a cause of action. A statute of limitations does

not begin to run until the cause of action accrues. Oregon courts have consistently applied the judicial doctrine of the discovery rule to determine when a cause of action accrues for purposes of a statute of limitations when the legislature has not done so. *See, e.g., Gaston, supra.*

nant with Oregon's discovery rule for purposes of the accrual of a cause of action. Under the "disinterested majority" version of the doctrine of adverse domination, in order to begin the running of the statute of limitations, the defendants must show that someone other than the allegedly culpable directors had knowledge of the cause of action and both the ability and the motivation to bring suit. Adverse domination is presumed when the allegedly culpable directors constitute a majority of the Board of Directors. *FDIC v. Howse,* 736 F.Supp. 1437, 1441 (S.D.Tex.1990). Here, from 1984 until the appointment of a receiver in January of 1990, the defendants constituted a majority of the Board of Directors of Family Federal. In fact, the defendants comprised the entire Board of Directors of Family Federal from 1984 until 1987. The affidavits submitted by the defendants fail to show that someone other than the defendants had sufficient knowledge and both the ability and the motivation to induce Family Federal to bring a cause of action against a majority of its Board of Directors.[5] At this stage in the proceedings, the court concludes that the defendants have failed to show that they are entitled to summary judgment.

■ The defendants also argue that the FHLBB had knowledge of facts sufficient to show that Family Federal had a cause of action against its officers and directors and that such knowledge should be imputed to the RTC. However, the Ninth Circuit has rejected similar theories in the context of other regulatory schemes. *See, e.g., Harmsen v. Smith,* 586 F.2d 156, 157 (9th Cir.1978) (holding that "the federal scheme of bank regulation creates no duty from the [government] to shareholders and directors of national banks."). Likewise, the court concludes that the bank examinations by the FHLBB were not intended to inform the corporation of potentially tortious conduct by one or more members of its Board of Directors or officers. *See First State Bank of*

*Hudson County v. United States,* 599 F.2d 558, 563–64 (3rd Cir.1979), *cert. denied,* 444 U.S. 1013, 100 S.Ct. 662, 62 L.Ed.2d 642 (1980).

The court concludes that the defendants have failed to establish as a matter of law that the claims for negligence, breach of fiduciary duty, and breach of contract accrued before January 10, 1988. Accordingly, the motion of the defendants for summary judgment on the ground that the claims of Family Federal were time-barred before the RTC was appointed as receiver is denied.

Because the court has denied the motion of the defendants for summary judgment, the court declines to address the argument of the RTC that the defendants should be equitably estopped from raising the defense of the statute of limitations because they fraudulently concealed material facts evincing a cause of action.

#### 2. *The Federal Law Claims of the RTC*

■ The RTC contends that it alleged claims for negligence, breach of fiduciary duty, and breach of contract against the defendants, both under federal and state law. *See* Plaintiff's Response to Defendants' Motion for Summary Judgment, p. 1. The defendants argue that "RTC's claims must be derived from state law because federal law [12 U.S.C. § 1821(k) (1989)] limits RTC to claims not pleaded here—claims alleging gross negligence or intentional misconduct by defendants." Memorandum in Support of Defendants' Motion for Summary Judgment, p. 10, n. 3. The defendants rely on *RTC v. Gallagher,* 10 F.3d 416 (7th Cir.1993). In *Gallagher,* the Seventh Circuit held that section 1821(k) of the FIRREA preempts the federal common law and establishes a gross negligence standard of liability for officers and directors of failed federally-chartered financial institutions. However, in the case of *FDIC v. McSweeney,* 976 F.2d 532 (9th Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct.

---

5. The defendants argue that if this court applies the doctrine of adverse domination, it should hold that the presence of a single disinterested director on the Board of Directors would begin the running of the statute of limitations. The defendants do not argue, however, that they can

meet their burden of proof under the "disinterested majority" version of the doctrine of adverse domination. *See* Reply Memorandum in Support of Defendants' Motion for Summary Judgment, p. 23.

2440, 124 L.Ed.2d 658 (1993), the Ninth Circuit interpreted section 1821(k) of the FIRREA as having a limited preemptive effect such that state laws insulating officers and directors from claims for gross negligence or requiring a higher standard of culpability are preempted. The *McSweeney* court reasoned that under the savings clause of the FIRREA, the receiver's "rights to proceed against the officers [or directors] for negligent breach of the duty of care, whether under state or federal common law, are preserved by the plain language of the last sentence of § 1821(k)." 976 F.2d at 538. *See also FDIC v. Canfield,* 967 F.2d 443 (10th Cir.) (en banc), *cert. dismissed,* —— U.S. ——, 113 S.Ct. 516, 121 L.Ed.2d 527 (1992).

This court recognizes that other circuits have concluded that section 1821(k) preempts both the federal common law and state law claims for negligence against the officers and directors of a failed financial institution. *See RTC v. Gallagher, supra.* However, applying Ninth Circuit precedent, the court concludes that the claims of the RTC for negligence, breach of fiduciary duty, and breach of contract, whether under state law or federal law, are not preempted under section 1821(k). Accordingly, this court must determine whether the doctrine of adverse domination applies to delay the accrual of those causes of action for purposes of the statute of limitations.[6]

In order to determine when the claims of the RTC under federal law accrued, the court applies the federal discovery rule. *See Admiralty Fund v. Hugh Johnson & Co.,* 677 F.2d 1301, 1309 (9th Cir.1982) (federal law determines when the statute of limitations begins to run even when a state statute of limitations applies to a claim under federal law). For the same reasons that the appellate courts of the State of Oregon would adopt the doctrine of adverse domination, the court concludes that the Ninth Circuit would adopt the doctrine of adverse domination as a corollary to the federal discovery rule. *See also Mosesian v. Peat, Marwick, Mitchell & Co.,* 727 F.2d 873, 879 (9th Cir.), *cert. denied,* 469 U.S. 932, 105 S.Ct. 329, 83 L.Ed.2d 265 (1984); *Adams v. Clarke,* 22 F.2d 957 (9th Cir.1927); *Cf. Schilling v. Parman,* 35 F.2d 780, 781 (D.Or.1928) (holding that the statute of limitations does not begin to run on claims against the former directors of a failed national bank until the former directors of the bank no longer controlled the bank). The court also finds persuasive the reasoning of the court in *Farmers & Merchants Nat'l Bank v. Bryan,* 902 F.2d 1520 (10th Cir. 1990). Under the doctrine of adverse domination, the defendants have failed to establish as a matter of law that the claims of the RTC under federal law accrued before January 10, 1988. Accordingly, the motion of the defendants for summary judgment as to the claims of the RTC under federal law is denied.

## CONCLUSION

The court concludes that the Oregon Supreme Court would adopt the doctrine of adverse domination to delay the accrual of a cause of action against officers and directors of a corporation until the allegedly culpable officers and directors no longer controlled the corporation. The court also concludes

---

6. The parties dispute the applicable statute of limitations on the claims of the RTC for breach of implied contract. The RTC argues that Oregon's six-year statute of limitations for contract actions applies to its claims for breach of fiduciary duty and breach of implied contract because there is a substantial question regarding whether those claims sound in contract or tort. The RTC relies on *FDIC v. Former Officers & Directors of Metro. Bank,* 884 F.2d 1304 (9th Cir.1989), *cert. denied sub nom., Lee v. FDIC,* 496 U.S. 936, 110 S.Ct. 3215, 110 L.Ed.2d 662 (1990). *See* Plaintiff's Response to Defendants' Motion for Summary Judgment, p. 33. The defendants argue that a claim for breach of fiduciary duty that is based on a special non-contractual relationship, rather than on a contractual relationship, is subject to a two-year statute of limitations for tort actions under the holding in *Association of Unit Owners of the Inn at Otter Crest v. Far West Federal Bank,* 120 Or.App. 125, 133, 852. P.2d 218 (1993). The court, however, need not address which statute of limitations applies to the federal or the state law claims of the RTC for breach of fiduciary duty and breach of implied contract because even if the shorter statute of limitations applies, the court concludes that, under the doctrine of adverse domination, the claims of the RTC did not accrue more than two years before the RTC was appointed receiver of Family Federal.

that the doctrine of adverse domination is consistent with Ninth Circuit precedent. The court concludes that, at this stage in the proceedings, the defendants have failed to show as a matter of law that someone other than the allegedly culpable officers and directors knew of the cause of action against the officers and directors and had both the ability and the motivation to induce Family Federal to bring a cause of action against a majority of its Board of Directors. Accordingly, the motion of the defendants for summary judgment as to the claims of the RTC for negligence, breach of fiduciary duty, and breach of contract (# 21) is denied.

The court finds that whether 12 U.S.C. § 1821(k) preempts federal common law and whether the doctrine of adverse domination would delay the accrual of the federal and/or state law claims of the RTC are controlling questions of law as to which there are substantial grounds for differences of opinion. The court also finds that an immediate appeal from the order would materially advance the ultimate termination of the litigation. Therefore, the defendants may make application for appeal under the provisions of 28 U.S.C. § 1292(b).