Argued and submitted October 14, 2003, resubmitted en banc October 27, 2004, reversed and remanded February 9, respondent Borg-Warner Automotive, Inc.'s, petition for reconsideration filed March 15, and respondent Tenneco Automotive Operating Company, Inc.'s, petition for reconsideration filed March 16, allowed by opinion June 29, 2005
See 200 Or App 406 (2005)

Lawrence KELLER
and Patricia Keller,
*Appellants,*

*v.*

ARMSTRONG WORLD INDUSTRIES, INC., et al,
*Defendants,*

*and*

BORG-WARNER AUTOMOTIVE, INC.,
a Delaware corporation,
fka Borg-Warner Corporation,
individually and as successor-in-interest to
Borg-Warner Corporation - Borg & Beck Division,
and Borg-Warner Corporation - Rockford Clutch Division;
and Tenneco Automotive Operating Company, Inc.,
a Delaware corporation,
*Respondents.*

0010-10816; A117518

107 P3d 29

Lloyd F. Leroy argued the cause for appellants. On the opening brief were Robyn L. Stein, Diane Abraham, Gil Purcell, and Brayton♦Purcell, and on the reply brief were Elaine J. Brown, Robyn L. Stein, Jon M. Egan, Gil Purcell, and Brayton♦Purcell.

Alan Gladstone argued the cause for respondent Borg-Warner Automotive, Inc., and Thomas W. Sondag argued the cause for respondent Tenneco Automotive Operating Company, Inc. With them on the joint brief were Abbott, Davis, Rothwell, Mullin & Earle, P.C., and Lane Powell Spears Lubersky LLP.

Before Brewer, Chief Judge, and Edmonds, Landau, Haselton, Armstrong, Linder, Wollheim, Schuman, and Ortega, Judges, and Deits, Judge pro tempore.

DEITS, J. pro tempore.

Edmonds, J., dissenting.

## DEITS, J. pro tempore

Plaintiffs appeal after the trial court granted summary judgment to defendants on plaintiffs' claims for injuries related to plaintiff Lawrence Keller's exposure to asbestos.[1] The trial court held that the claims were barred by ORS 30.907, the applicable statute of limitations. We reverse.

Because we are reviewing summary judgment in defendants' favor, we state the facts in the light most favorable to plaintiff and draw all reasonable inferences in his favor. ORCP 47 C; *Jones v. General Motors Corp.*, 325 Or 404, 420, 939 P2d 608 (1997). Plaintiff worked as a automobile mechanic beginning the early 1960s. He specialized in muffler and exhaust work; part of the time he owned a small muffler business. Defendants Borg-Warner Automotive, Inc., and Tenneco Automotive Operating Company, Inc., manufactured or supplied some of the mufflers on which plaintiff worked.[2] During the time period when plaintiff worked on mufflers, it was common for mufflers to be wrapped in asbestos. As a result, plaintiff was exposed to asbestos when he replaced old, crumbling mufflers. He also worked for a company that made mufflers. Part of his job involved cutting sheets of asbestos and wrapping them around muffler cores, again exposing him to asbestos fibers. In addition, plaintiff was exposed to exhaust fumes on the job and was a smoker.

In the early 1980s, plaintiff began experiencing shortness of breath. In 1986, he saw Dr. Patterson, a pulmonologist, who diagnosed interstitial lung disease. Patterson asked plaintiff about his work environment and learned that he was exposed to asbestos, among other things. He performed a bronchoscopy that showed mild interstitial fibrosis and black lung but no asbestos bodies. Patterson told plaintiff that his exposure to asbestos and exhaust fumes was harmful and recommended that he sell his muffler business.

---

[1] Plaintiff Patricia Keller is Lawrence Keller's wife and brings a claim for loss of consortium. References to "plaintiff" in this opinion are to Lawrence Keller.

[2] Plaintiffs brought claims against other defendants, but those claims are not before us on appeal. The judgments from which plaintiffs appeal comply with the version of ORCP 67 B that was in effect when the judgments were entered. We understand that the provisions of House Bill 2646 (2003) do not affect our analysis. *See* Or Laws 2003, ch 576.

He also suggested that plaintiff stop smoking, which plaintiff tried to do several times over the following years. Patterson did not tell plaintiff that asbestos exposure was the cause of his lung problems, but he did indicate that asbestos might be the cause. In 1987, plaintiff sold his muffler business. He thereafter purchased a building supplies store in Oakridge and moved there.

In 1991, plaintiff was referred to Dr. Kintz because of continuing lung problems. After conducting an examination and reviewing pulmonary function studies and a chest x-ray, Kintz had a "suspicion * * * that [plaintiff] has mild pulmonary fibrosis, possibly related to asbestos exposure. The records from Portland that I have certainly do not indicate any confirmed inflammatory interstitial disease." Kintz ordered a bronchoscopic biopsy; at the time of the biopsy, Kintz described plaintiff as having a "ten year history of restrictive lung disease related to prior asbestos or muffler fume exposure." At that time, Kintz noted that plaintiff's chest x-ray revealed "minor interstitial changes." No records related to this biopsy or Kintz's diagnosis after the biopsy are in the record.

In December 1991, plaintiff filed an application for social security disability benefits, stating that he had "lungs fibrous" and that the cause of his lung problems were exhaust fumes, dust, and asbestos.[3] According to plaintiff, his lung capacity had been decreasing and an x-ray in 1992 showed "black spots" in his left lung. In November 1992, Kintz wrote a short statement supporting plaintiff's claim, stating that plaintiff's condition satisfied the criteria for disability for a patient with pulmonary fibrosis. Kintz did not, however, indicate a cause of that condition.

In 1993, plaintiff visited the emergency room at Providence Medical Center because of abdominal pain. The chart notes from that visit indicate that, in discussing his

---

[3] The record does not indicate what action was taken on plaintiff's claims for social security disability benefits or on his claims—mentioned in the text below—for workers' compensation benefits. Defendants, during oral argument before the trial court in support of their motion for summary judgment, assumed that the claims had been denied.

medical history with the examining physician, plaintiff reported that he was being treated for asbestosis.

In 1994, plaintiff had surgery for an aortic aneurysm. In preparation for that surgery, he saw Patterson again for a preoperative evaluation. In that evaluation, Patterson stated that plaintiff had "[i]nterstitial lung disease, etiology uncertain[.]" He reviewed plaintiff's asbestos-related work history, noting that plaintiff's job that involved cutting sheets of asbestos "represent[s] a significant asbestos exposure." Patterson noted that plaintiff's 1986 bronchoscopy had shown no asbestos bodies and, in connection with plaintiff's chest x-ray, "[n]o changes pathognomic of asbestos exposure are noted." He further noted that, three weeks before the evaluation, plaintiff had again quit smoking. In the conclusion of his report, Patterson noted that "the importance of continuing without cigarettes was emphasized."

Later in 1994, plaintiff submitted a "reconsideration disability report" in connection with his application for social security disability benefits. Plaintiff reported that his shortness of breath had worsened and that Kintz had advised him that, because of his "asbestos lungs" and psychological problems related to his illness, he should not try to carry on his regular work duties.

In January 1995, plaintiff filed a claim for workers' compensation benefits, asserting that he had "asbestos lung" from exposure to asbestos from manufacturing and installing exhaust systems. As part of the evaluation of that claim, SAIF referred plaintiff to Dr. Smith for examination. Smith reviewed plaintiff's medical records and chest x-rays spanning a 20-year period and performed a number of additional tests. He concluded that plaintiff's condition was not asbestos related:

> "This patient has a very unusual history and has been followed at the Thoracic Clinic since 1974. Serial chest x-rays were reviewed and there has been no evidence of significant progressive interstitial disease or an asbestos-related condition. The patient had definite exposure to asbestos most likely in the form of chrysotile blankets. The exposure would be characterized as relatively light in lifetime exposure and at best, moderate. It is unlikely that the exposure

would be heavy enough to cause asbestosis. The clinical findings are consistent with the occupational exposure history. There is no evidence of asbestos-related pleural disease or pleural thickening or pleural fibrosis. There is no evidence of asbestos-related interstitial disease or asbestosis. * * *

"I believe his case can be closed in that he has no asbestos related condition."

SAIF asked both Patterson and Kintz to review Smith's report, and each signed a statement indicating that he agreed with all of the report.[4]

In 2000, Dr. Schaumberg, a pulmonologist, reviewed CT scans of plaintiff's chest performed in August and November 1999, as well as the results of plaintiff's pulmonary function tests. In a letter to plaintiff's attorney, Schaumberg wrote that plaintiff "clearly has a[n] interstitial lung disease with a restrictive pulmonary defect. Given his history of asbestos exposure, the most likely etiology is because of asbestosis."

Plaintiff filed his complaint in this case on October 23, 2000. Defendants moved for summary judgment, arguing that the action was barred by the applicable statute of limitations. As noted, the trial court granted the motions. We will affirm only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. ORCP 47 C. As we explain below, a genuine issue of material fact exists in this case with respect to when plaintiff knew or should have known that he had an asbestos-related disease, and we accordingly reverse the grant of summary judgment.

---

[4] Defendants argue that there is no evidence that plaintiff knew about Smith's report or Patterson's and Kintz's concurring statements, and therefore plaintiff cannot rely on them to establish a genuine issue of material fact. We reject that argument because, even if it is not reasonable to infer that plaintiff knew about the report and the statements, the question presented here is not only what plaintiff *knew*, but also what he *would have known* had he inquired. The dissent observes that defendants argue that the fact that there is no evidence that plaintiff knew about the report and the statements should undercut plaintiff's ability to rely on them here. 197 Or App at 476-77 (Edmonds, J., dissenting). However, as the dissent elsewhere correctly observes, we should impute to plaintiff knowledge that he had a reasonable opportunity to learn. *Id.* at 476 n 1, 481. Smith's report and Patterson's and Kintz's concurring statements may well have become part of plaintiff's treating doctors' files, and, moreover, it is not clear why we should not consider all sources of information available to a plaintiff in order to determine what he or she had a reasonable opportunity to learn.

The applicable statute of limitations, ORS 30.907, provides that a product liability action for asbestos-related disease must be commenced "not later than two years after the date on which the plaintiff first discovered, or in the exercise of reasonable care should have discovered, the disease and the cause thereof." The parties do not dispute that plaintiff had symptoms before 1998. Accordingly, the sole issue is whether plaintiff discovered, or should have discovered, before October 23, 1998, that those symptoms were related to asbestos. According to defendants, plaintiff discovered, or should have discovered, that his symptoms were related to asbestos before that date. Plaintiff argues the contrary. According to plaintiff, the most the medical evidence from before 1998 revealed was that he had lung disease. In plaintiff's view, the evidence demonstrates that the cause of that disease was uncertain. According to plaintiff, all that he and his treating physicians knew was that his symptoms *might* be caused by asbestos. It is plaintiff's position that his knowledge before 1998 that his disease *might* have been caused by asbestos is not sufficient knowledge to trigger the statute of limitations as a matter of law. Instead, according to plaintiff, a triable issue of fact exists as to whether, given the facts that defendant knew, a reasonable person should have known, or in the exercise of reasonable care should have discovered, that his disease was asbestos related.

■     This case requires us to construe ORS 30.907, and, consequently, we are guided by the interpretive principles set out in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993). ORS 30.907 provides:

"A product liability civil action for damages resulting from asbestos-related disease shall be commenced not later than two years after the date on which the plaintiff first discovered, or in the exercise of reasonable care should have discovered, the disease and the cause thereof."

ORS 30.907 has not been construed by the Supreme Court or by this court. However, the Supreme Court has construed wording in ORS 12.110(4), the statute of limitations for medical malpractice actions, that, except for being in the passive

voice, is identical to wording in ORS 30.907. ORS 12.110(4) provides, in part:

> "An action to recover damages for injuries to the person arising from any medical, surgical or dental treatment, omission or operation shall be commenced within two years from the date when the injury is first discovered or in the exercise of reasonable care should have been discovered."

Both ORS 12.110(4) and ORS 30.907 define the beginning of the limitations period as when a plaintiff "first discovered or in the exercise of reasonable care should have discovered" the pertinent elements. It is that wording that indicates when the legislature intended that the periods of limitation begin to run. Because the wording that indicates when the periods of limitation begin to run is identical, cases construing the meaning of the phrase "first discovered or in the exercise of reasonable care should have discovered" in ORS 12.110(4) are helpful in determining the meaning of that phrase in ORS 30.907. *See, e.g., Robinson v. Nabisco, Inc.*, 331 Or 178, 184, 11 P3d 1286 (2000) (prior case law interpreting the same statutory wording considered at first level of statutory interpretation); *State v. Ford*, 188 Or App 424, 428, 72 P3d 93 (2003) (same).

■■    The two statutes differ notably in one respect: ORS 12.110(4) pertains to when an "injury" is or should have been discovered, while ORS 30.907 pertains to when a disease and its cause is or should have been discovered. "Injury," as used in ORS 12.110(4), means "legally cognizable harm" and is comprised of three elements: harm, causation, and tortious conduct. *Gaston v. Parsons*, 318 Or 247, 255, 864 P2d 1319 (1994). Because the legislature specifically referred only to harm and causation in ORS 30.907, and did not use the term of art "injury," the issue of when a plaintiff knew or should have known about a defendant's tortious conduct will not arise in assessing when the period of limitations began to run in an asbestos-related disease claim. Tortious conduct is not something of which a plaintiff must have knowledge in order for the period of limitations to commence. We accordingly observe that cases addressing issues of what a plaintiff must

know to be aware of tortious conduct under ORS 12.110(4) may be of limited help in construing ORS 30.907.

In light of that difference between the two statutes, the dissent takes us to task for relying on constructions of ORS 12.110(4) in determining the meaning of ORS 30.907. 197 Or App at 473, 483-87 (Edmonds, J., dissenting). According to the dissent, "[c]ontrary to the majority's assertion, the legislature did not use 'identical wording' in the statutes to trigger the beginning of the limitations period." 197 Or App at 483 (Edmonds, J., dissenting). With respect, that is simply incorrect. The words that describe *when* the periods of limitation begin to run are the same; what differs is *what* a plaintiff must have discovered for the periods to commence. What the dissent ignores is that the legislature used identical wording in the two statutes to set the bar for *when* the limitations period begins to run. In both statutes, that happens when the plaintiff "discovers or should have discovered" certain things, namely particular elements of his or her claim. The only difference between the statutes is the elements that must be discovered to start the limitations period.[5]

In both statutes, the legislature has indicated that a plaintiff must have the *same level of certainty* of the required elements in order to trigger the limitations period. Specifically, the statute of limitations begins to run for either type of claim when the plaintiff "first discovered or in the exercise of reasonable care should have discovered" the pertinent elements. ORS 30.907; ORS 12.110(4). It is such wording that has been construed as creating a "discovery rule" in statutes

---

[5] The dissent points to ORS 30.905 to support its argument that the legislature could have used "injury" in ORS 30.907 if it had wanted to. ORS 30.905 is the statute of limitations generally applicable to product liability claims. The dissent notes that, in ORS 30.905(2)(a), the legislature indicated that the statute begins to run when the plaintiff " 'discovers, or reasonably should have discovered, the personal injury' *and its causal relationship to the defendant's product.*" 197 Or App at 483 (Edmonds, J., dissenting) (quoting ORS 30.905(2)(a); emphasis added). "Injury" in ORS 30.905(2)(a) is not used in the same sense as in ORS 12.110(4)). For one thing, "injury" in ORS 12.110(4) includes causation within it, *Gaston*, 318 Or at 255, so if the legislature had intended "injury" in ORS 30.905(2) to have the same meaning as in ORS 12.110(4), the wording emphasized above would be mere surplusage. Moreover, the modifier "personal" and the alternative element "property damage" in ORS 30.905 indicate that, as a whole, the phrase "personal injury or property damage" refer to the "harm" element of a plaintiff's product liability claim. The analogue of that phrase in ORS 30.907 would thus be "disease."

of limitation. *See Gladhart v. Oregon Vineyard Supply Co.,* 332 Or 226, 231, 26 P3d 817 (2001).[6] In light of the similarities between the statutes, and in the absence of any legislative indication that the identical wording be construed differently, we rely on constructions of the identically phrased discovery rule in ORS 12.110(4) to discern the meaning of the discovery rule in ORS 30.907.

In its most recent case construing ORS 12.110(4), the Supreme Court observed:

> "The period of limitations in [ORS 12.110(4)] commences from the earlier of two possible events: (1) the date of the plaintiff's *actual discovery* of injury; or (2) the date when a person exercising reasonable care *should have discovered* the injury, including learning facts that an inquiry would have disclosed."

*Greene v. Legacy Emanuel Hospital,* 335 Or 115, 123, 60 P3d 535 (2002) (emphasis in original). Applying the *Greene* formulation of the issue to this case, we must determine whether it is possible to say, *as a matter of law,* that plaintiff actually discovered the cause of his disease before October 23, 1998, or that a person exercising reasonable care should have discovered the cause of his disease before that date. *See also Schiele v. Hobart Corporation,* 284 Or 483, 489, 587 P2d 1010 (1978) (applying general personal injury statute of limitations to occupational disease claim; observing that "the statute of limitations on claims involving negligent infliction of an occupational disease does not begin to run until the plaintiff knows, or as a reasonably prudent person should know, that he has the condition for which his action is brought and that defendant has caused it").

In *Gaston,* the Supreme Court concluded that a plaintiff "first discovered or in the exercise of reasonable care should have discovered" the elements of a statute of limitations when the plaintiff had knowledge of "facts [that] would make a reasonable person aware of a *substantial possibility* that each of the * * * elements * * * exists." 318 Or at 256 (emphasis added). The court noted that a plaintiff need not

---

[6] In *Gladhart,* the Supreme Court pointed to ORS 30.907 (then numbered ORS 30.905(3) (1983)) as a statute that expressly contains a discovery rule. 332 Or at 232-33.

know each element with certainty, but a plaintiff must have more than a "mere suspicion" in order to have "discovered" the element. *Id.* at 255-56. The requisite level of certainty, the court concluded, is awareness of a "substantial possibility" of the existence of the relevant elements.[7]

■       The exact contours of a "substantial possibility" are difficult to articulate in the abstract. As we explain below,

---

[7] Some opinions construing ORS 12.110(4) discuss only the plaintiff's awareness of tortious conduct. *See* 197 Or App at 473 (Edmonds, J., dissenting). However, that is because the plaintiffs' awareness of the other elements was undisputed. In *Greene*, 335 Or at 119, 121, for example, the plaintiff was aware immediately after surgery that there had been a complication and that it was the result of the defendant's conduct. In *Doe v. American Red Cross*, 322 Or 502, 508-09, 512-13, 910 P2d 364 (1996), the plaintiffs conceded on summary judgment that they knew that plaintiff John Doe had become HIV-positive as a result of a transfusion of blood collected by the defendant. In *Gaston*, the plaintiff did not dispute that he knew with certainty that his left arm was numb and did not function as a result of the surgery performed by the defendant soon after the surgery. Accordingly, the sole issue in those cases was whether the plaintiffs had sufficient certainty about the third element—tortious conduct—to trigger the statute of limitations. Under *Gaston* and its progeny, substantial possibility is required as to harm and causation—elements that also appear in ORS 30.907—as well as to tortious conduct.

Although we have not found a case in which we or the Supreme Court has expressly applied the "substantial possibility" standard to an element of a statute of limitations other than tortious conduct, *Berry v. Branner*, 245 Or 307, 421 P2d 996 (1966), illustrates why applying that standard to all elements of a statute of limitations is appropriate. In *Berry*, the defendant performed a hysterectomy on the plaintiff in 1956. The plaintiff began to suffer pain in her lower back and upper leg within several months after the surgery. The cause of her pain—a surgical needle left in her abdomen during the hysterectomy—was not discovered until 1965. Given the difficulty of establishing the connection between the needle and its effects, it would seem appropriate that a plaintiff have a quantum of awareness between mere suspicion and actual knowledge—*i.e.*, awareness of facts supporting a substantial possibility—before she is deemed to have "discovered" causation in such a case. *Berry* was decided long before *Gaston*, but, as the Supreme Court noted in *Gaston*, ORS 12.110(4) was intended to codify the discovery rule announced in that case. 318 Or at 254.

The Supreme Court has consistently indicated that a plaintiff must have the same level of certainty about *each* pertinent element to begin the period of limitations. *E.g.*, *Gaston*, 318 Or at 256 ("[T]he statute of limitations begins to run when the plaintiff knows or in the exercise of reasonable care should have known facts [that] would make a reasonable person aware of a substantial possibility that *each of the three elements (harm, causation, and tortious conduct) exists*." (Emphasis added; citation omitted.)); *Doe*, 322 Or at 514 ("*Gaston* holds that a defendant in a summary judgment motion must establish that the plaintiff knew or in the exercise of reasonable care should have known facts [that] would have made a reasonable person aware of a substantial possibility that *each of the three elements (harm, causation, and tortious conduct) existed*." (Emphasis added; citation omitted.).

determining whether that standard has been met in a particular case requires careful consideration of all the facts available to a plaintiff and all the surrounding circumstances. Having considered the meaning of the phrase "substantial possibility" as used by the Supreme Court, the meaning of the statutory term "discover," and the purpose behind the discovery rule, we conclude that a "substantial possibility" connotes something less than a preponderance, but still a fairly high level of certainty, and certainly more than a suspicion.

As noted, the court did not address in *Gaston* or in subsequent cases, nor have we, the meaning of the phrase "substantial possibility." A "possibility" is "[s]omething that is possible." *The American Heritage Dictionary of the English Language* 1414 (3d ed 1996). "Possible," in turn, means "[c]apable of * * * existing[ ] or being true without contradicting proven facts" or "[o]f uncertain likelihood." *Id.* Standing alone, use of the term "possibility" would suggest that knowledge of any plausible set of facts, however uncertain, would trigger the statute of limitations. But "possibility" does not stand alone; the court modified "possibility" with the word "substantial," which means "[t]rue or real; not imaginary," "[a]mple," or "[c]onsiderable in importance, value, degree, amount, or extent." *Id.* at 1791. Accordingly, the court indicated that the level of possibility required here is fairly high. The plain meaning of the term "substantial possibility" indicates that a plaintiff must have an awareness of facts that indicate the existence of his or her disease and its cause with a considerable degree of likelihood in order for the statute of limitations to be triggered.

That view is consistent with the plain meaning of the statutory term "discover" that the court was construing when it adopted the "substantial possibility" test. "Discover" means, as relevant here, "to make known (something secret, hidden, unknown or previously unnoticed)" or "to come to know something not previously known." *Webster's Third New Int'l Dictionary* 647 (unabridged ed 2002). To "know" means "to apprehend with certitude as true, factual, sure, or valid." *Id.* at 1252. The term "discover" used by the legislature thus carries a connotation of a high degree of certainty, indicating that the legislature intended that the period of limitations

not begin to run until a plaintiff has a high degree of certainty about the facts that would support the elements of his or her claim identified in the statute of limitations.

■ That conclusion is bolstered by the court's reiteration in *Gaston* of the familiar principle that "[t]he discovery rule is designed to give plaintiffs a reasonable opportunity to become aware of their *claim*." 318 Or at 255-56 (citing *Frohs v. Greene*, 253 Or 1, 4, 452 P2d 564 (1969); emphasis added). Similarly, both this court and the Supreme Court have indicated that statutes of limitations begin to run only when a plaintiff knows the facts necessary "to support his right to judgment." *Stevens v. Bispham*, 316 Or 221, 227, 851 P2d 556 (1993) (internal quotation marks omitted); *Hoeck v. Schwabe, Williamson & Wyatt*, 149 Or App 607, 612, 945 P2d 534 (1997). That requirement supports the view that, to trigger the statute of limitations, a plaintiff must have a high degree of certainty about the elements of the statute.

■■ "Ordinarily, the question of whether and when an employee knew or should have known that he had an occupational disease is one of fact for the jury." *McCoy v. Union Pacific Railroad Co.*, 102 Or App 620, 624, 796 P2d 646 (1990) (applying similar standard for statute of limitations under the Federal Employers' Liability Act); *see also Gaston*, 318 Or at 256; *Hoeck*, 149 Or App at 612 ("Precisely when a person reasonably should have known that the harm suffered was caused by another's negligence generally presents a question of fact."). Thus, if a factual dispute exists about whether plaintiff actually discovered the cause of his disease before 1998 and about whether a person exercising reasonable care should have discovered that cause before 1998, summary judgment was inappropriate. *See Greene*, 335 Or at 120. In assessing whether such a factual dispute exists, we impute to plaintiff knowledge of all facts that he had a reasonable opportunity to discover, which includes all facts in the summary judgment record in this case.

■ We agree with the dissent to the extent that it asserts that a plaintiff can be held to have discovered the pertinent elements of his or her claim if he or she had a reasonable opportunity to become aware of facts that would support them. Actual knowledge is not required; a plaintiff may not

avoid the bar of the statute of limitations by failing to make a further inquiry that would have revealed facts that would have supported the pertinent elements of his or her claim. That is why we impute to plaintiff knowledge of all facts reasonably available to him, which in this case includes all of the evidence in the summary judgment record. To the extent, however, that the dissent suggests that we should speculate about what else plaintiff might have learned had he inquired, 197 Or App at 481 (Edmonds, J., dissenting), as we explain below, 197 Or App at 468-70, that approach has been squarely rejected by the Supreme Court. To the extent that the dissent argues that the facts in this record establish causation to a sufficient level of certainty as a matter of law, we disagree.

Based on the record in this case, we conclude that a factual dispute exists about whether plaintiff actually discovered the cause of his disease before 1998 and about whether a person exercising reasonable care would have discovered that cause before 1998. We agree with plaintiff that the facts available to him simply do not establish, as a matter of law, that he discovered, or reasonably should have discovered, before 1998 that there was a considerable degree of certainty that his symptoms were caused by asbestos. On the contrary, his treating doctors consistently expressed uncertainty about the nature of his condition and identified several possible causes.

To review the evidence, in 1986, Patterson told plaintiff that asbestos "might" be the cause of his symptoms, but he also told plaintiff that exhaust fumes were harmful and that he should stop smoking. In 1991, Kintz had a "suspicion" that plaintiff had mild pulmonary fibrosis, "possibly" related to his exposure to asbestos; Kintz also described plaintiff's symptoms as being related to asbestos or muffler fume exposure. In 1992, when Kintz stated that plaintiff had pulmonary fibrosis, he did not indicate a cause. In 1994, Patterson stated that the "etiology [of plaintiff's condition was] uncertain." In 1995, Smith concluded that plaintiff's condition was not related to asbestos, and both Patterson and Kintz concurred. Finally, in 2000, Schaumberg stated that the "most likely etiology" of plaintiff's condition was asbestosis.

Given that factual record, a factfinder could reason as follows: Before Schaumberg's opinion in 2000, the record shows only that plaintiff's physicians were uncertain about the nature and cause of plaintiff's disease. Although they thought that plaintiff's symptoms *might* be related to asbestos, they also told him that the exhaust fumes that he had been exposed to were harmful and that he should quit smoking. Before he received Schaumberg's opinion in 2000, plaintiff did not have available sufficiently certain information about the cause of his symptoms to conclude that he knew, or should have known, with a considerable level of certainty that his disease was caused by asbestos. Based on that view of the record, a factfinder could conclude that plaintiff had not discovered, nor should a reasonable person have discovered, the cause of plaintiff's disease before October 23, 1998.

In addition, as the court noted in *Gaston*, whether a reasonable person would be aware of a substantial possibility of one of the elements of the statute of limitations depends on all the relevant circumstances. 318 Or at 256. In cases involving medical conditions, the existence of alternative possible causes and the plaintiff's awareness of such possible causes are relevant circumstances. *See McCoy*, 102 Or App at 624 ("[W]hether off-the-job exposures could have contributed to the condition [is] relevant to the question of whether the plaintiff had knowledge of the condition and its cause.").[8]

In this case, plaintiff's doctors consistently expressed uncertainty about the cause of his disease and gave him several alternative explanations for his symptoms. In that respect, this case is similar to those malpractice and products liability cases in which courts have held that statutes of limitation did not begin to run where plaintiffs

---

[8] The dissent would, in effect, limit the relevant circumstances that might affect the beginning of the limitations period to a single circumstance: the existence of a doctor-patient relationship between a potential defendant and the plaintiff. 197 Or App at 483-86 (Edmonds, J., dissenting). A number of other circumstances, however, may prevent a plaintiff from discovering the pertinent elements of a statute of limitations. An example of such other circumstances—*i.e.*, a causal relationship that was medically difficult to detect—existed with respect to causation in *Berry*. 245 Or at 308. Similarly, in this case, equivocal medical advice about causation and the offering of alternative possible causes could allow a reasonable juror to conclude that plaintiff did not have a factual basis for sufficient certainty about the cause of his disease to trigger the statute of limitations.

received reassurances from defendants that prevented plaintiffs from having sufficient certainty about the existence of facts pertaining to the elements of the statutes of limitation. *See Gaston,* 318 Or at 260-61; *Forest Grove Brick v. Strickland,* 277 Or 81, 559 P2d 502 (1977); *Hoeck,* 149 Or App at 613-14; *Penuel v. Titan/Value Equities Group, Inc.,* 127 Or App 195, 200-01, 872 P2d 28, *rev den,* 319 Or 150 (1994); *Hoffman v. Rockey,* 55 Or App 658, 662-63, 639 P2d 1284, *rev den,* 292 Or 722 (1982). In those cases, a manufacturer's assurance that a product could be fixed or a doctor's assurance that an untoward effect was normal and not the result of negligence presented each plaintiff with several alternative explanations for the injury, only one of which supported the plaintiff's tort claim. In this case, similarly, plaintiff was presented with several alternative explanations, only one of which supports his asbestos-related disease claim.

Of course, in this case, the alternative explanations were not presented with the intent of hiding a tortfeasor's wrongdoing or liability. That intent is not important, however; the effect of an awareness of the existence of alternative explanations on a reasonable person is. Where, as here, a plaintiff's doctors consistently express uncertainty about the cause of disease and present him or her with a number of equally plausible factual explanations for his or her disease, that may preclude the conclusion that he or she knew, or should have known, as a matter of law, that one of those explanations was sufficiently correct to trigger the statute of limitations. *See Lundy v. Union Carbide,* 695 F2d 394, 397 (9th Cir 1982) (where the plaintiff's doctor indicated that the plaintiff's symptoms could have "numerous causes," including exposure to asbestos, smoking, and exposure to formaldehyde fumes, grant of summary judgment on statute of limitations ground was improper); *Hutchison v. Semler et al,* 227 Or 437, 361 P2d 803 (1961) (exposure to silica dust on the job was the only identified explanation for the plaintiff's silicosis; jury instruction on statute of limitations upheld).

This is not a case of competing medical opinions. It is a case in which plaintiff's treating physicians consistently expressed uncertainty about the cause of his symptoms. As late as 1994, one of those doctors indicated that the etiology of his symptoms was uncertain. Two other possible causes for

his symptoms—exhaust fumes and smoking—were identified. When confronted in 1995 with a report that stated repeatedly that asbestos was not the cause of plaintiff's symptoms, his treating physicians concurred, which was consistent with their earlier and ongoing expressions of uncertainty about the cause of his disease. Given that record, we cannot say *as a matter of law* that plaintiff knew, or reasonably should have known, that there was a considerable likelihood that the cause of his disease was asbestos.

■ It appears that at some times plaintiff held a subjective belief that his symptoms were caused, at least in part, by asbestos. However, plaintiff's subjective belief is not determinative of the question of what a reasonable person should have known about the elements of a statute of limitations, because that issue is determined using an objective standard. *Doe v. American Red Cross*, 322 Or 502, 512, 910 P2d 364 (1996); *Gaston*, 318 Or at 256. Considering the question of what plaintiff *knew*, we note that belief and knowledge are not synonymous. At best, plaintiff's subjective belief could support an inference that he had discovered that asbestos caused his condition. However, drawing that inference would favor defendants. Because plaintiff is the nonmoving party, we must draw all reasonable inferences in his favor, not in defendants' favor. An equally reasonable inference in light of this record is that plaintiff, a layman, knowing that he had lung problems and knowing that asbestos was dangerous, formed his own belief about the cause of his condition, despite having been told by his physicians that asbestos was only one of several possible causes.[9]

Moreover, there is evidence from which a reasonable juror could conclude that, had plaintiff directly inquired of the physicians he saw before 2000, he would have been told that his disease was *not* caused by asbestos, contradicting his apparent assumption that asbestos was its cause. In 1995, Smith definitively stated that plaintiff's condition was *not* related to asbestos, and both of plaintiff's treating physicians

---

[9] It is also possible that plaintiff had other lung problems early on, but only later developed an asbestos-related disease. If that were the case, then plaintiff could not have discovered a disease that he did not have at the time. The parties do not frame their arguments in that manner, however, and, accordingly, we do not address that possibility.

stated that they agreed with that conclusion. That evidence supports an inference that, had plaintiff asked Patterson and Kintz directly in 1995 whether his condition was caused by asbestos, they would have said, "No."[10]

■ A plaintiff's subjective belief that asbestos caused his symptoms must be supported by some objective evidence, and that evidence must be sufficiently certain to satisfy the "substantial possibility" standard. Although a positive diagnosis is not always required, *Schiele*, 284 Or at 490, neither can a plaintiff's unsupported belief that one of several causes of a disease identified by his physicians is *the* cause be sufficient. To hold otherwise would be to conclude, as a matter of law, that the period of limitations begins to run on an asbestos-related disease claim when a plaintiff's doctors are uncertain about the cause of his or her disease and indicate to the plaintiff that there are several possible causes of his or her disease, only one of which is asbestos, and the plaintiff subjectively believes that asbestos is the cause.

Finally, we note that defendants have not argued that plaintiff could have received, before October 23, 1998, a different medical opinion that would have established more definitively that his symptoms were caused by asbestos. Presumably defendants did not raise that argument because there is no evidence in the summary judgment record to support it. *See Doe*, 322 Or at 514-15 (because no evidence was submitted that addressed what the plaintiffs would have learned had they inquired, record did not permit summary judgment for defendants).

■ Moreover, we observe that, to the extent that it could be argued that plaintiff had discovered facts that triggered a "duty to inquire" further about the cause of his symptoms, a "duty to inquire" standing alone is not sufficient to cause the period of limitations to begin to run; a factual question will

---

[10] We agree with the dissent that, had the period of limitations already begun to run before that report, the report would not have unrung the bell. *See* 197 Or App at 477-78 (Edmonds, J., dissenting). However, from the beginning, plaintiff's physicians had consistently expressed uncertainty about the cause of his condition. Their concurrence in Smith's conclusion that plaintiff "ha[d] no asbestos related condition" supports a reasonable inference that plaintiff's doctors never had sufficient certainty about causation to have communicated an opinion about causation to plaintiff.

persist until the facts learned as a result of the inquiry would cause a reasonable person to discover that his or her symptoms are asbestos related. *See Greene*, 335 Or at 123. The dissent's assertion that "the issue in this case turns on whether plaintiff's failure before 1998 to make a *further inquiry* about the cause of his disease constitutes the lack of diligence expected of a reasonable person," 197 Or App at 475 (Edmonds, J., dissenting) (emphasis in original), is accordingly misleading. As the court made clear in *Doe* and *Greene,* the existence of a duty to inquire and failure to do so are not, standing alone, sufficient to support a conclusion that the period of limitations began to run as a matter of law. There must also be evidence that, had a plaintiff inquired, he or she would have learned facts sufficient to support the pertinent elements of his or her claim. We have imputed to plaintiff knowledge of all facts in the summary judgment record. Defendants introduced no evidence on summary judgment about what plaintiff would have learned, had he inquired further.

Accordingly, the dissent's statement that "[t]he majority and I * * * appear to agree that the limitations period begins to run * * * when the obligation to undertake reasonable efforts to discover a claim occurs" is not entirely accurate. 197 Or App at 483 (Edmonds, J., dissenting). We agree that actual knowledge is not required, but we dispute that the obligation to undertake reasonable discovery efforts, *standing alone*, triggers the statute of limitations as a matter of law. As the court made clear in *Doe* and *Greene*, that obligation must be accompanied by evidence of what the plaintiff would have learned had he or she undertaken the discovery efforts. Such evidence is necessary to establish what a plaintiff "should have known"; we cannot create such evidence if it is not in the record. In this case, defendants put no evidence into the record about what plaintiff would have learned had he inquired further. As explained above, 197 Or App at 482, we impute to plaintiff all the evidence in the record. In our view, the crux of our disagreement with the dissent is whether that evidence is sufficient to establish as a matter of law that plaintiff knew or should have known by 1998 that his disease was related to asbestos. We hold that it is not.

The dissent takes issue with our conclusion that there is a genuine issue of material fact as to whether plaintiff knew, or should have known, that his disease was asbestos related before 1998. Under the dissent's analysis, there is only one conclusion that a reasonable juror could reach on that issue.[11] We do not disagree that a reasonable juror *could* conclude that plaintiff had access to sufficiently certain facts to make him aware of a substantial possibility that his disease was caused by asbestos. However, for the reasons explained above, we do not agree that a reasonable juror would be *compelled* to reach that conclusion. Given the state of the record in this case, and drawing reasonable inferences in plaintiff's favor, the question of whether the information available to plaintiff was sufficient to trigger the statute of limitations in this case should go to a jury.

We hold that, in the light of the conflicting evidence, there is a genuine issue of material fact as to when plaintiff knew or should have known, in the exercise of reasonable care, that he had an asbestos-related disease. Because there is a genuine issue of material fact, the trial court erred in granting summary judgment in favor of defendants.

Reversed and remanded.

**EDMONDS, J.,** dissenting.

The majority holds that a factual dispute exists about whether plaintiff actually discovered the cause of his disease before 1998 and about whether a person exercising reasonable care should have discovered the cause of his disease before 1998. It concludes therefore that summary judgment for defendants under ORS 30.907, the applicable statute of limitations, is precluded. For the reasons that follow, I disagree.

---

[11] In reaching that conclusion, the dissent relies on inferences that favor defendants, *e.g.*, an inference that plaintiff's conduct in selling his muffler business, filing disability claims, and making certain statements to other medical providers establishes that he had actual knowledge of the cause of his disease and an inference that an attorney who represented plaintiff before 1998 could have advised him about the viability of a product liability claim. 197 Or App at 476 (Edmonds, J., dissenting). Because the trial court granted defendants' motion for summary judgment, however, it is inappropriate for us to draw those inferences in their favor.

ORS 30.907 provides:

"A product liability action for damages resulting from asbestos-related disease shall be commenced not later than two years after the date on which the plaintiff first discovered, or in the exercise of reasonable care should have discovered, the disease and the cause thereof."

Plaintiff filed his complaint against defendants on October 23, 2000. It follows that, if the statute was triggered before October 1998, plaintiff's action is untimely.

Plaintiff alleges that his "asbestos-related disease was clinically diagnosed no earlier than April, 2000." Specifically, he argues:

"The evidence presented by defendants does not show that plaintiffs first knew or should have discovered plaintiff's asbestos-related disease and the cause thereof more than two years prior initiating the action. The evidence shows that plaintiff knew he suffered from interstitial fibrosis. The evidence also shows that plaintiff knew he was exposed to asbestos, and that he had been told by his doctor that asbestos could cause disease. The record is also clear, however, that plaintiff was repeatedly told that his doctors could not establish an actual cause for his disease. The evidence presented by defendants establishes that plaintiff's treating physicians were uncertain as to the cause of his disease, and that plaintiff's claims for disability compensation from the Social Security Administration had been twice denied for lack of evidence of disease. * * *

"In addition to the evidence provided by defendants, plaintiff provided evidence that his claim for Workers' Compensation benefits was denied for lack of evidence of asbestos-related disease. * * * [P]laintiff's counsel has a qualified expert witness who is available and is willing to testify that plaintiff now has an asbestos-related disease."

The following factual chronology is uncontradicted in the summary judgment evidentiary record:

1.  By the 1970s, plaintiff knew "without a doubt" that he had been exposed to asbestos in the 1960s during the course of his work.

2. By the mid-1980s, plaintiff was experiencing breathing problems. He was referred to Dr. Patterson, a pulmonologist. Plaintiff testified in his deposition that he knew that asbestos might be hazardous to his health. When asked when he first learned that asbestos might be hazardous to his health, plaintiff replied, "That probably was the first time was from Dr. Patterson." He added, "Dr. Patterson told me I should get out of the exhaust business completely" because his exposure to asbestos could be causing his breathing problems. As a result of that advice and reading articles about the health risk of asbestos exposure, plaintiff sold his muffler repair business "probably a year" later, "just to get out of it, to get away from it."

3. In May 1991, plaintiff was referred to Dr. Kintz, also a pulmonologist. Kintz reported that he was given a history that "sounds like [plaintiff] had interstitial lung disease that was not given any specific treatment." He concluded at that time that "[my] suspicion is that [plaintiff] has mild pulmonary fibrosis, possibly related to asbestos exposure." In December 1991, plaintiff filed a claim with the Social Security Administration relying on the opinions of Patterson and Kintz. In a report made pursuant to his social security claim, plaintiff stated, "I feel the prolonged exposure to exhaust fumes, dust [and] asbestos for so many years is to blame for my lung condition." In March 1992, he filed a second social security disability claim because of "decreasing lung function."

4. By November 1992, plaintiff was represented by an attorney, apparently with regard to his disability claim. Kintz advised plaintiff's attorney that plaintiff met the criteria for disability for patients with pulmonary fibrosis.

5. In December 1993, plaintiff reported to an emergency room physician at Providence Medical Center in Portland that he was currently "being treated for asbestosis."

6. In November 1994, plaintiff asked for reconsideration of his social security disability claim in which he said that Kintz had informed him that his "asbestos lungs" would not permit him to "carry on [his] regular work duties[,]" and that "[m]y asbestos lungs only get worse with time. * * *

Dr. Kintz and Dr. Patterson have both informed me no treatment will stop my lungs. Will just get worse."

7. In January 1995, plaintiff filed a workers' compensation claim in which he describes his injury as "[e]xposure to asbestos from manufacturing [and] installation of exhaust systems."

This is a case of first impression; no Oregon appellate court has previously construed the meaning of ORS 30.907. In construing the meaning of a statute, our task is to discern the intent of the legislature. We undertake that task by first examining the text and the context of the statute, taking into account the commonly understood meaning of the words used in the statute. The majority gives lip service to that principle but then detours off into an analysis of the case law decided under ORS 12.110(4). Because our respective approaches differ to such a great extent, it is helpful to initially summarize where the majority and I agree and disagree, before proceeding further in an analysis of the language of ORS 30.907.

1. The majority and I agree that the disposition of this case is controlled by the meaning of ORS 30.907 and the "cases addressing issues of what a plaintiff must know to be aware of tortious conduct under ORS 12.110(4) may be of limited help in construing ORS 30.907." 197 Or App at 458-59. We also agree that the statutes have different elements. The limitations period in ORS 12.110(4) is triggered on the date "when the injury is first discovered or in the exercise of reasonable care should have been discovered." In contrast, the limitations period in ORS 30.907 begins not later than two years after the date on which the plaintiff "discover[s], or in the exercise of reasonable care should have discovered the disease and the cause thereof."

2. The majority and I agree that we are aware of no other Oregon appellate case that has applied the "substantial possibility" test to any statute of limitations outside the confines of the word "injury" in ORS 12.110(4) *and* that the cases that have used that test have applied it to the element of "tortious conduct," a component of an "injury" under ORS 12.110(4).

3. I also agree with the majority that, for purposes of ORS 12.110(4) and determining whether an "injury" has triggered the limitations period in that statute, the element of causation could be satisfied by a "substantial possibility" of causation.

4. I disagree, however, that the case law under ORS 12.110(4) informs the meaning of ORS 30.907 and with the majority's assertion that the "substantial possibility test" under ORS 12.110(4) applies to ORS 30.907. Later in this opinion, I explore more fully the reasons for our disagreements.

5. But even if the "substantial possibility" test applies to the element of causation in ORS 30.907, that test is satisfied here as a matter of law. There are no genuine issues of *material* fact that preclude summary judgment under ORCP 47 C. That ultimate conclusion is based on the analysis that immediately follows.

The proper analysis of the legislature's intent underlying ORS 30.907 begins and ends with a first-level examination of its text and context under rules of *PGE v. Bureau of Labor and Industries,* 317 Or 606, 610-11, 859 P2d 1143 (1993). Under the statute, the limitations period begins "not later than two years after the date on which the plaintiff [bringing a product liability civil action for damages resulting from an asbestos-related disease] first discovered, or in the exercise of reasonable care should have discovered the disease and the cause thereof." The statute's language is in the alternative; its limitations period commences when the plaintiff actually discovers the disease and its cause, or, in the alternative, when the plaintiff in the exercise of reasonable care should have discovered the disease and the cause thereof. The words "to discover" in the context of the statute mean "to obtain for the first time sight or knowledge of." *Webster's Third New Int'l Dictionary* 647 (unabridged ed 2002). The words "or in the exercise of reasonable care should have discovered, the disease and the cause thereof" in ORS 30.907 embody what is commonly known as the "discovery rule" regarding statutes of limitations. *Gladhart v. Oregon Vineyard Supply Co.,* 332 Or 226, 234, 26 P3d 817 (2001). "Discovery rules," when promulgated by the legislature, exist

because "[i]t is manifestly unrealistic and unfair to bar a[n] * * * injured party's cause of action before he has had an *opportunity* to discover that it exists." *Gaston v. Parsons*, 318 Or 247, 261, 864 P2d 1319 (1994) (quoting *Frohs v. Greene*, 253 Or 1, 4, 452 P2d 564 (1969) (emphasis added)). The test is an objective one. Actual knowledge of an element of the action, or in the context of the facts of this case, actual knowledge of causation, is not required. The proper inquiry is how a reasonable person would have acted in the same or similar circumstances regarding the making of an inquiry as to the cause of his disease. *See Woolston v. Wells*, 297 Or 548, 557, 687 P2d 144 (1984) (defining the standard of reasonable care). A discovery rule does not permit a plaintiff to sleep on his rights and permit an opportunity to discover the cause of his disease to pass. Rather, a plaintiff must "make a further inquiry if a reasonable person would have done so." *Gaston*, 318 Or at 256. The failure to make an inquiry at a time when a reasonable person would have done so will result in the limitations period beginning to run.

Plaintiff's arguments about the meaning of the words of ORS 30.907 are at odds with the above principles. He focuses on the "actual knowledge" component of the statute without meaningfully engaging in the alternative test under the statute of whether he had a reasonable opportunity to discover his claim. Thus, when properly framed, the issue in this case turns on whether plaintiff's failure before 1998 to make a *further inquiry* about the cause of his disease constitutes the lack of diligence expected of a reasonable person. With regard to that issue, plaintiff concedes that, beginning in the late 1980s, his treating physicians talked to him about the risks of exposure to asbestos in the products that he used at work and that they believed that his interstitial lung disease could be due to his lengthy asbestos exposure. It is difficult to conceive how the legislature could have contemplated any greater opportunity for plaintiff to discover the cause of his disease and to bring a claim pursuant to what he discovered than to consult with and receive advice from his own medical providers. But there is even more evidence that plaintiff had the opportunity to discover the cause of his disease based on his own conduct. After receiving Patterson's advice in the 1980s, plaintiff sold his business within the next

year, a business that continued to expose him to asbestos. Also, he read articles about the health risks arising from exposure to products at about the same time.

Moreover, plaintiff thereafter represented to medical treatment providers that his lung disease was caused by asbestos, and he filed disability claims making those representations. In December 1991 and again in March 1992, plaintiff filed social security claims in which he asserted that his lung disease was due to "prolonged exposure to exhaust fumes, dust [and] asbestos for so many years * * *." Plaintiff repeated his contention made in December 1991 as to causation in his workers' compensation claim filed in January 1995. When asked to describe "fully" the circumstances giving rise to his claim for compensation, plaintiff wrote, "Exposure to asbestos from manufacturing [and] installation of exhaust systems." Noteworthy is that he was represented at some point by an attorney with regard to his social security asbestos-related claim. Of course, representation by counsel on a related claim is always an objective factor used by courts in determining whether a discovery statute is triggered by a reasonable opportunity.[1] Thus, the evidence is compelling and uncontradicted that not only did plaintiff have a reasonable opportunity to discover the cause of his disease, but he affirmatively pursued legal remedies predicated on his belief that asbestos was the cause of his lung disease.

Plaintiff, nevertheless, relies in major part on Dr. Smith's April 1995 evaluation, which occurred after he filed his workers' compensation claim. Smith, examining plaintiff for an insurer, concluded that "[plaintiff] has no asbestos related condition."[2] Plaintiff asserts that Smith's report

---

[1] It makes no difference to the issue of imputed discovery whether plaintiff was unaware of the contents of the medical reports of his physicians. Because the reports were prepared by his own treating doctors, it is reasonable to impute their contents to him to assess whether he had a reasonable opportunity to discover them.

[2] Smith also said regarding plaintiff's decreased lung capacity, "I have no explanation for this reduction other than to say there is no evidence that this is due to asbestosis." Smith thought it "unlikely" that plaintiff's "exposure would be heavy enough to cause asbestosis." Rather, according to Smith, plaintiff's history of restrictive lung disease with decreased lung function over many years duration was "most likely simply related to inconsistent, inadequate efforts" on the part of the patient.

undercuts the previous medical findings, particularly in light of the fact that Kintz and Patterson subsequently concurred with Smith's report through a "check the box" form. But defendants counter that there is no evidence that plaintiff was ever informed of the Smith report or the concurrences by Patterson and Kintz. In addition, it is apparent that plaintiff would not rely on Smith's report to establish liability against defendants because it is contrary to his allegation that he presently suffers from an asbestos-related disease. In other words, plaintiff is relying on Smith's report for the purpose of avoiding the bar of the statute of limitations, while at the same time asserting the contrary proposition that defendants' products caused plaintiff's disease. The purpose of ORS 30.907 is to bar stale claims based on a failure to reasonably discover them; it does not operate to bar claims when there are conflicting medical opinions. The inconsistency of plaintiff's positions seems incongruous in light of the statute's purpose, which presumes liability to determine whether the claim is barred by actual knowledge or by the failure to take advantage of a reasonable opportunity to become aware of the claim.[3]

Regardless of the above circumstances, there is a more compelling conceptual problem with the consideration of Smith's report as part of the analytical calculus, a problem that goes to the heart of plaintiff's position. Focusing on Smith's report causes the analysis to take into account the accumulated information in the summary judgment record rather than to consider what plaintiff discovered or reasonably could have discovered before that time. For purposes of the issue of assessing when plaintiff had a reasonable opportunity to discover his claim, we must determine when the limitations period *began,* based on the information reasonably available during any particular point in time in the chronology rather than at the end of the chronology. That is because Smith's April 1995 report could not have operated to toll the limitations period after it had expired. Moreover,

---

[3] I do not wish to appear to be unsympathetic to plaintiff's plight and his disease but we are charged with the enforcement of statutes of limitation by the legislature who enacted them. It is unlikely that the legislature would have intended that the bar of a limitations period could be avoided by the use of evidence that a plaintiff must controvert to establish liability.

Smith's report cannot operate to create a genuine issue of material fact about when, in the exercise of reasonable care, plaintiff should have discovered the cause of his disease, if, in fact, a reasonable opportunity to discover the disease existed at an earlier time.

Finally, in deciding when plaintiff had a reasonable opportunity to discover the cause of his disease, it is useful to compare the content of Patterson's and Kintz's reports with regard to the findings of Dr. Schaumberg, the pulmonologist on whom plaintiff relies as the source of his purported "initial" discovery of the cause of his disease. That comparison informs the issue because it tells us what information plaintiff obtained from Schaumberg that was purportedly not available at an earlier time from his other medical providers. In May 1991, Kintz reported, based on pulmonary functions studies, that plaintiff had a restrictive lung disease. He wrote, "My suspicion is that [p]laintiff has mild pulmonary fibrosis, *possibly related to asbestos exposure.*" (Emphasis added.) In June 1991, Kintz wrote, "This is a 49[-year-old] man with ten year history of restrictive lung disease *related to prior asbestos or muffler fume exposure.*" (Emphasis added.) He concluded in that report that plaintiff suffered from "Restrictive lung disease, likely secondary to interstitial fibrosis."

In 1994, Patterson prepared a preoperative evaluation for surgery that was to be performed on plaintiff for another condition. Patterson described plaintiff as having "known lung disease" and indicated that the etiology of that disease was "uncertain." But in another portion of that report, he wrote,

> "A bronchoscopy in 1986 showed mild interstitial fibrosis and anthracosis, but no asbestos bodies. In 1960 [plaintiff] began working in the muffler business, and for about five years worked at Portland Muffler where they wrapped the inside cores of the muffler with asbestos. The asbestos arrived in sheets, and was cut with a knife. He continued working in the muffler business, but the first five years represent a significant asbestos exposure.
>
> *"He has no other pertinent history as regards interstitial lung disease."*

(Emphasis added.)

In comparison to the above findings that occurred before 1998, Schaumberg reported in April 2000:

> "[Plaintiff] has requested that I contact you regarding the diagnosis of his lung disease. [Plaintiff] is a 57 year old gentleman who presents with interstitial infiltrates consistent with pulmonary fibrosis on his computed tomography (CT) scan of the chest, both from August 1999 as well as November 1999. This is associated with a restrictive pulmonary defect on his pulmonary function tests[.] * * *

> "[Plaintiff] worked extensively with asbestos for a period of five[ ] years, beginning in 1960, when he was working with mufflers, which were wrapped in asbestos on a daily, continuous basis. He had a much less intense exposure to asbestos for the subsequent 20 years where he was working with mufflers that did have asbestos associated with them but were not wrapped in asbestos.

> "[Plaintiff] has no other diagnosis of diseases that have been associated with interstitial lung disease. *He has no other significant occupational, medication, or environmental exposures that could account for his interstitial lung disease.*

> "[Plaintiff] clearly has a [*sic*] interstitial lung disease with a restrictive pulmonary defect. Given his history of asbestos exposure, *the most likely etiology is because of asbestosis.*"

(Emphasis added.)

What the above comparison demonstrates is that Kintz, Patterson, and Schaumberg took the same medical history from plaintiff and that they performed the same or similar medical tests. Those tests revealed interstitial fibrosis in plaintiff's lungs. As to the cause of plaintiff's lung disease, Kintz wrote in 1991 that plaintiff's lung disease was "possibly related to" his exposure to asbestos. In another report, he said that plaintiff's disease was "related to prior asbestos or muffler fume exposure." Patterson reported in 1994 that plaintiff had no other "pertinent history" than his exposure to asbestos. Schaumberg opined, that, "[g]iven his history of asbestos exposure, the *most likely* etiology is because of asbestosis." (Emphasis added.) When read together, the evidence is uncontroverted that plaintiff's

asbestos exposure was the suspected cause of his lung disease as early as 1991. Significantly, this is not a case where the evidence shows that it was impossible to have discovered the cause of the disease before 2000 or that a significant change in plaintiff's condition resulted in the cause of the disease being discovered in 2000 for the first time. Viewing the entire summary judgment evidentiary record in the light most favorable to plaintiff, the most that can be said is that Schaumberg was the first doctor to report what was the "most likely" cause of the previously reported alternative causes of plaintiff's disease.

At the core of the majority's position that summary judgment is precluded on this record is its assertion that the record does not demonstrate that there was available to plaintiff a definitive medical opinion before October 1998 regarding causation of plaintiff's disease because of the possibility of other causes of his disease. *See, e.g.*, 197 Or App at 465, 466-67. First, that argument tends, in the abstract, to conflate the application of the two tests for discovery under the statute. Second, the language of ORS 30.907 focuses on the awareness of the plaintiff. Nothing in the statute's language requires that a plaintiff have a medical opinion or medical experts in hand that opine that a particular degree of certainty as a statutory element exists before the limitations period begins to run. Rather, the statute focuses on the time period in which the *plaintiff* himself "first discovered, or in the exercise of reasonable care should have discovered, the disease and the cause thereof." For purposes of this case, the pertinent time period to focus on is the same time period in which plaintiff filed his disability and workers' compensation claims. In light of plaintiff's personal belief about the cause of his disease, his knowledge of the hazards of exposure to asbestos products, the knowledge of his doctors about his exposure to asbestos products and plaintiff's physical condition, and their opinions regarding alternative causes during that time period, I would hold that plaintiff first discovered the causation of his disease for purposes of his asbestos liability claim against defendants when he discovered it for purposes of his other claims.

But even if the majority is correct that a trier of fact could reasonably find that plaintiff lacked the actual knowledge required for the limitations period to begin in the pertinent time period, and it is assumed that plaintiff did not inquire and was not told by his doctors what was the cause of his disease,[4] a reasonable person under plaintiff's circumstances would have made such an inquiry during that time period. Plaintiff cannot avoid the bar of the statute by failing to make a further inquiry that a reasonable person would have made under the same circumstances. *Gaston*, 318 Or at 256. No reasonable person, knowing what plaintiff knew by 1994 and desiring to explore the filing of a civil claim for damages against defendants, would have failed to inquire about the cause of his disease. Even Patterson's and Kintz's alleged uncertainty as to which alternative cause of plaintiff's disease was the most likely cause would not have prevented a reasonable person from conducting a further investigation of the cause of his disease through his own doctors or through a further inquiry of other medical professionals.

Significantly, plaintiff does not contend that there was any intervening circumstance between 1991 and 1994 that operated as an impediment to the making of such an inquiry. Moreover, plaintiff cannot rely properly on his failure to make a further inquiry regarding causation by asserting that there is no evidence in the summary judgment record that such an inquiry at that time would have established actual causation. Such a rule enables him to file a stale cause of action and to thereby postpone the beginning of a limitations period without undertaking the reasonable inquiry to ascertain whether defendants' products caused his disease required by the statute. By ignoring the opportunity that would otherwise prompt a person exercising reasonable diligence to make further inquiry, plaintiff effectively frustrates the policy underlying ORS 30.907 to bar stale claims.[5]

---

[4] In his deposition, plaintiff was asked whether his doctors told him that his difficulty in breathing was related to asbestos exposure. Plaintiff responded, "No. I mean that he never came out and gave me a diagnosis, no." Even if plaintiff is correct that his doctors did not expressly tell him that his lung disease was related to asbestos exposure, he admits that he discussed his exposure to asbestos with both Patterson and Kintz and that Patterson told him that he "should get out of the exhaust business."

[5] Under the majority's view of the reasonable discovery rule in ORS 30.907, the record must show that, had plaintiff inquired, he would have learned facts

As applied to this case, the reasonable discovery doctrine placed on plaintiff the affirmative duty to inquire as to the cause of his disease during the time period between 1991 and 1994 because a reasonable person would have inquired further under the same circumstances. What this summary judgment record shows, based on uncontradicted facts, is that plaintiff believed that he was suffering from asbestosis based on his own knowledge of the consequences of his asbestos exposure and his doctors' confirmation that asbestos could be a cause of his condition. What the uncontradicted evidence also shows is that sometime between 1991 and 1994, plaintiff was represented by an attorney and that he filed claims alleging that his disease was caused by his asbestos exposure. There is only one legal conclusion that can arise from these facts. As a matter of law, plaintiff had the same opportunity between 1991 and 1994 to ascertain whether he had a cause of action against defendants that he had before he consulted with Schaumberg six years later. It follows that the limitations period in ORS 30.907 began and expired before 1998 and that the trial judge correctly granted summary judgment to defendants.

---

sufficient to support his claim to "a high degree of certainty," or "a considerable degree of likelihood." *See* 197 Or App at 462-63. The insertion of those requirements into ORS 30.907 to commence the limitations period is problematic for several reasons. Apparently, under the majority's view, the jury would determine whether the weight of the evidence known to plaintiff before the filing of the claim satisfies a standard of "fairly high" certainty in deciding a statute of limitations defense. That kind of instruction to the jury effectively amends ORS 30.907, which requires an assessment of "reasonableness" and not an assessment of the weight of the evidence known to the plaintiff. Also, such a rule appears to obviate the statutory duty in ORS 30.907 to make further reasonable inquiry to discover facts that are unknown, because the jury's determination under the majority's rule will necessarily be based on the evidence of the plaintiff's actual awareness before the filing of his claim. What medical evidence through additional diagnosis or testing could have been developed if reasonable inquiry had been made at a particular time will in many instances never be known by either party, and each side will be reduced at trial to speculation because of the absence of a further inquiry. Moreover, the majority's rule instructs plaintiffs to delay the filing of their claims in court until their discovery of facts that, in their view, carry a fairly high certainty of persuasiveness. That creates a trap for plaintiffs, and it operates to the detriment of defendants in defending against stale claims. Besides creating the potential for manipulation of the limitations period by permitting parties to ignore opportunities to make further discovery, the majority's interpretation of ORS 30.907, at a minimum, causes the duty under the statute to make further reasonable inquiry to lose its standard of objectivity that operates for the benefit of both plaintiffs and defendants.

I now turn again to the majority's analysis and, more particularly to the areas of our disagreement. As I understand the majority's opinion, we agree that ORS 30.907 and ORS 12.110(4) address different theories of liability, negligence and strict liability, and that they contain different elements. The majority and I also appear to agree that the limitations period begins to run under both statutes when actual knowledge of a claim occurs or when the obligation to undertake reasonable efforts to discover a claim occurs. Where we differ is that the majority believes that "the legislature used identical wording in the two statutes to set the bar for *when* the limitations period begins to run," 197 Or App at 459 (emphasis in original), and that, "[i]n both statutes, the legislature has indicated that a plaintiff must have the *same level of certainty* of the required elements in order to trigger the limitations period." 197 Or App at 459 (emphasis in original). By "the same level of certainty," I understand the majority to refer to the "substantial possibility" test in ORS 12.110(4).

Contrary to the majority's assertion, the legislature did not use "identical wording" in the statutes to trigger the beginning of the limitations period. The limitations period under ORS 12.110(4) does not begin to run until an "injury" occurs, and the word "injury" and its subparts appear only in ORS 12.110(4).[6] The "substantial possibility" test is a part of the refinement for the test of an "injury" under the Supreme Court case law interpreting ORS 12.110(4). Significantly, the word "injury" in the statute as defined in *Gaston* does not appear in ORS 30.907, although clearly, the legislature knew how to predicate the beginning of a product liability statute of limitations based on the actual or imputed discovery of an injury. *See, e.g.,* ORS 30.905(2)(a) (the statute of limitations commences two years after the date on which the plaintiff discovers, or reasonably should have discovered, the personal injury and its causal relationship to the defendant's product).

---

[6] For purposes of ORS 12.110(4), an "injury" that triggers the commencement of the limitations period consists of "harm," "causation," and "tortious conduct." *Gaston,* 318 Or at 255.

Although the statutes share a common policy to commence the limitation period when there is a reasonable opportunity to discover a claim, the paths that the statutes take to implement that policy are discrete. ORS 12.110(4) pertains to claims founded in negligence, and it focuses on the "injury" arising from medical or dental malpractice where the circumstances surrounding an adverse medical outcome may prohibit a reasonably careful person from discovering the malpractice of the treatment provider.[7] The reasonable opportunity to discover the "injury" in a medical malpractice claim is influenced by the physician/patient relationship because the tortfeasor physician has the ability through assurances to the patient to delay a reasonable person from becoming aware that an "injury" has occurred. *Gaston*, 318 Or at 257. As the *Gaston* court noted,

> "[t]he significance of the physician's statements is that they are circumstances to be considered in determining the reasonableness of the plaintiff's actions. Any statement made by the physician * * * is to be considered along with other circumstances (*e.g.*, the nature of the harm, the nature of the surgery performed) in evaluating when a plaintiff reasonably should have discovered that he or she was suffered a legally cognizable harm."

*Id.* at n 9. In fact, as the *Gaston* court observed, "[a] physician's assurances may be particularly influential on a plaintiff because the physician-patient relationship is 'a relationship of trust and confidence * * * in which continued treatment or other resort to the skills of the defendant is required.'" *Id.* at 257 (quoting *Cavan v. General Motors*, 280 Or 455, 458, 571 P2d 1249 (1977) (ellipsis in original)).

Recall that the goal of the reasonable discovery doctrine is to avoid the circumstance in which the limitations period expires before a plaintiff has the opportunity to discover the existence of the claim. *Frohs*, 253 Or at 4. What is unique about ORS 12.110(4), when contrasted with other

---

[7] ORS 12.110(4) provides, in pertinent part, that:

"An action to recover damages for injuries to the person arising from any medical, surgical or dental treatment, omission or operation shall be commenced within two years from the date when the injury is first discovered or in the exercise of reasonable care should have been discovered."

statutes of limitations, is that it applies to tortious conduct arising out of physician/patient relationships where such relationships are potential impediments to the opportunity of plaintiffs to reasonably discover their claims. Those impediments to discovery drive the need to quantify how much information is enough information for purposes of the statute before the limitations period commences. The *Gaston* court's response to those impediments was to formulate a "quantum of awareness" rule. The court explained:

> "Actual knowledge that each element [of an 'injury'] is present is not required. On the other hand, a mere suspicion [of medical malpractice] is insufficient to begin the statute of limitations to run. We believe that a *quantum of awareness* between the two extremes is contemplated by the statute. Therefore, the statute of limitations begins to run when the plaintiff knows or in the exercise of reasonable care should have known facts which would make a reasonable person aware of a substantial possibility that each of the three elements (harm, causation, and tortious conduct) exists.
>
> "We emphasize that this is an objective test. In most cases, the inquiry will concern what a plaintiff should have known in the exercise of reasonable care. In such cases, the relevant inquiry is how a reasonable person of ordinary prudence would have acted in the same or similar situation. * * * *Relevant to this analysis will be a plaintiff's failure to make a further inquiry if a reasonable person would have done so.*"

*Gaston*, 318 Or at 256 (emphasis added).

Thus, the words "mere suspicion" and "substantial possibility" are used by the *Gaston* court to describe the dividing point on a scale of awareness sufficient to trigger the beginning of the limitations period in ORS 12.110(4) for purposes of the particular circumstances that the statute addresses. The rule that a "mere suspicion" of an injury on the part of a putative plaintiff in a medical malpractice case will not trigger the beginning of the limitations period reflects the understanding that plaintiffs, as lay persons and patients, are not expected to know about medical matters within the exclusive knowledge of the plaintiff's adversary, the plaintiff's medical provider. The majority's assumption that a plaintiff must have the same level of certainty of the

required elements under both ORS 12.110(4) and ORS 30.907 misses the understanding that the "substantial possibility" test under ORS 12.110(4) exists to identify the point on the continuum of awareness at which a patient will be deemed to have the reasonable opportunity to become aware of his medical provider's negligence.

In contrast to ORS 12.110(4), ORS 30.907 does not address unique circumstances where discovery is inherently difficult because of physician/patient relationships. Rather, ORS 30.907 is an ordinary statute of limitations like other statutes of limitation that govern claims where there are not the kinds of impediments to the opportunity to discover the elements of a claim that exist under ORS 12.110(4). ORS 30.907 requires only that the plaintiff discover or, in the exercise of reasonable care, should have discovered "the disease and the cause thereof" in connection with a product liability claim.[8] Unlike under ORS 12.110(4), the information that a plaintiff needs to acquire to have a reasonable opportunity to bring a timely asbestos-related product liability claim is not in the possession of his adversary (an adversary with whom the plaintiff has a relationship of trust and confidence and where the adversary's assurances that nothing is wrong may be particularly influential) where it cannot be imputed to the plaintiff. The medical information about the nature of a plaintiff's disease and its cause is readily accessible to the plaintiff because the plaintiff need only inquire of a medical provider to become aware of the information contained in his medical records and the provider's opinion as to causation. In actuality, the medical provider is an ally of the plaintiff under ORS 30.907 rather than an adversary to discovery, and the knowledge of the medical provider under such circumstances is properly imputed to the plaintiff.

In summary, although the policy objectives of ORS 12.110(4) and ORS 30.907 are the same, the difference in the

---

[8] By way of analogy to ORS 12.110(4), the "tortious conduct" element of ORS 30.907 is found in ORS 30.900 and ORS 30.920. But unlike in medical malpractice claims, a plaintiff need not prove negligence or tortious conduct under those statutes. In fact, the legislature expressly reserved to parties injured by negligence the right to bring a claim based on common-law negligence in ORS 30.920(4), thereby expressing its intention that claims based on negligence and product liability satisfy different requirements.

circumstances that the statutes address operates to dispense with any need for the courts to superimpose a "mere suspicion/substantial possibility" sliding scale on the legislature's language in ORS 30.907. In effect, such a requirement would be superfluous because the impediments to discovery due to physician/patient relationships that exist under ORS 12.110(4) do not arise under ORS 30.907. There is no danger of the limitations period expiring under ORS 30.907 before a plaintiff can discover a claim due to a medical provider concealing pertinent information from a putative plaintiff. Where the legislature's language in a statute adequately expresses its intention, as occurs in ORS 30.907, this court has no authority, in the guise of interpretation, to add a gloss to the legislature's words, as occurs through the majority's insertion of ORS 12.110(4)'s "injury" requirements into ORS 30.907. *See* ORS 174.010 ("In the construction of a statute, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein[.]"). It is for that reason that I believe that the majority errs when it borrows from ORS 12.110(4) for purposes of interpreting ORS 30.907.

Additionally, the majority relies heavily on two cases, *Doe v. American Red Cross*, 322 Or 502, 910 P2d 364 (1996), and *Greene v. Legacy Emanuel Hospital*, 335 Or 115, 60 P3d 535 (2002), that were decided under ORS 12.110(4). It posits:

> "As the court made clear in *Doe* and *Greene*, that obligation must be accompanied by evidence of what the plaintiff would have learned had he or she undertaken the discovery efforts. Such evidence is necessary to establish what a plaintiff 'should have known'; we cannot create such evidence if it is not in the record. In this case, defendants put no evidence into the record about what plaintiff would have learned had he inquired further."

197 Or App at 469.

Presumably, the majority derives the rule that it asserts in the above paragraph because summary judgment was reversed in *Doe*. However, the rulings in the cases relied on by the majority, when considered in the context of their facts, do not support the proposition that, before summary

judgment is proper in *this* case, there must also be evidence that, had plaintiff inquired, he would have learned facts sufficient to support his claim against defendants. A comparison of the facts and rulings in each case with the facts in this case demonstrates the majority's error.

In *Doe*, an action was brought in 1990 against a blood bank and its former medical director on behalf of a recipient of a blood transfusion. The blood used in the transfusion contained human immunodeficiency virus (HIV). The threshold issue was when the plaintiff, in the exercise of reasonable diligence, should have inquired about defendants' alleged negligence. In 1987, plaintiff and the decedent learned that the blood used in the transfusion was infected. However, they made no inquiry whatsoever at that time about whether the defendants were negligent at the time that the blood was collected and used in the transfusion. The trial court granted summary judgment to the defendants on statute of limitations grounds under ORS 12.110(4). On appeal, the Supreme Court reversed. First, it held that the plaintiff's knowledge of the harm caused by the infected blood placed a duty on the plaintiff to make inquiry as to whether the defendants' negligence had caused the harm. 322 Or at 514. However, it held that the imposition of the duty to make further inquiry left open the issue of what the plaintiff would had learned, had he inquired. *Id.* at 515. That was because it was unknown from the summary judgment record what an inquiry in light of the state of medical science at that time with respect for testing for HIV and AIDS would have revealed. *Id.*[9] The court explained:

> "From the record that the parties made with respect to summary judgment, we conclude that plaintiff's knowledge in October 1978 of the harm caused to John Doe by HIV contaminated blood supplied by the Red Cross would have put plaintiff on inquiry notice of the existence of tortious conduct by defendants, as a matter of law. But the duty to inquire still left open the issue of what the Does would have learned *had they inquired.* That is, the existence of a duty to inquire does not foreclose the existence of a factual dispute

---

[9] The court observed, "This, however is not an ordinary case, because of the nascent state of the law and science with respect to HIV and AIDS at the pertinent time." *Doe*, 322 Or at 515.

concerning the question of what the Does would have learned. Application of the discovery rules 'knew or should have known' standard makes the issue of what the Does 'should have known' about the possibility of defendant's 'tortious conduct' an issue of material fact.

"Because no evidence was offered in connection with the motion for summary judgment that addressed the issue of what the Does would have learned had they made reasonable inquiry, the record does not permit an award of summary judgment to defendants."

*Id.*

In other words, the court in *Doe* held that, as a matter of law, the decedent was aware that he had been harmed by the infected blood that the defendants furnished to him. What remained as a factual issue was whether the defendants were negligent in furnishing him with infected blood in light of the state of the science of testing blood for HIV and AIDS at the time. Those holdings do not lead to the majority's rule that, in every case, the obligation to undertake reasonable discovery efforts must be accompanied by evidence of what the plaintiff would have learned if inquiry had been made. Rather, the court's holding in *Doe* that an issue of material fact existed was dependent on its particular facts— that is, whether the defendants were negligent depended on the state of the medical science in 1987 with regard to the testing of donated blood for HIV, and therefore a material issue of fact remained that precluded summary judgment.

Here, of course, the facts and the record are different than what existed in *Doe*. As the majority concedes, there is no "tortious conduct" element in this case. 197 Or App at 458-59. In contrast to the lack of evidence about negligence in *Doe*, it is uncontroverted that plaintiff was exposed to asbestos when he used defendants' products in his work. Here also, plaintiff's doctors determined that the cause of his lung disease could be asbestos exposure before 1993. Moreover, the evidence is uncontroverted that by 1991, plaintiff had read information regarding the nexus between lung disease and asbestos exposure, indicating that it was commonly known and publicized at that time that exposure to asbestos could cause the kind of lung disease from which plaintiff knew he

suffered. In other words, plaintiff's contention in this case is more aptly characterized as being about the adequacy of the evidence known to him and his doctors and whether their knowledge imposed a duty on plaintiff to make a further inquiry. *Doe* and its reasoning offers no assistance on that issue.

The majority's proposition finds no support in *Greene* either. In that case, the trial court granted summary judgment to the defendant physician in a medical malpractice claim deemed filed in November 14, 1997, and the Supreme Court affirmed. First, the court discouraged the use of the phrase "inquiry notice" with regard to the application of the limitations period in ORS 12.110(4). *Greene*, 335 Or at 123. Second, the court acknowledged that

> "*Doe* thus recognizes that the circumstances surrounding an adverse medical outcome might permit a reasonably careful person to discover only the *possibility* of the defendant's tortious conduct, rather than its existence and give rise to a duty to inquire. In that circumstance, according to *Doe*, factual questions about what the plaintiff should have discovered likely will persist until the facts learned as the result of an inquiry would cause a reasonable person to discover that tortious conduct occurred."

335 Or at 127 (emphasis in original). The court then contrasted the facts in *Doe* with the facts before it, observing:

> "In contrast to *Doe*, this case involves no novel principle or procedure of medical science and no uncertainty regarding the state of law. The record contains no other factual assertion that would support a conclusion that a reasonably careful plaintiff might not have discovered Nesler's [the plaintiff's doctor] tortious conduct from the injury that occurred during surgery. To paraphrase *Berry* [*v. Branner*, 245 Or 307, 421 P2d 996 (1966)], plaintiff is not a patient who had no way of immediately ascertaining her injury."

335 Or at 128. The *Greene* court then observed that, although the plaintiff argued that she did not receive " 'actual confirmation of negligent conduct by Dr. Nesler' until March 1997, when another doctor examined her medical records[,]" *id.*, those very medical records had been in the possession of plaintiff's lawyer since November 10, 1995. *Id.* at 129.

Based on those facts, the court reasoned:

"But, on the present record, the medical opinion that plaintiff received in March 1997 served only to confirm the discovery of tortious conduct that plaintiff reasonably should have made when she learned, soon after surgery, that the perforations had occurred. In other words, the facts that plaintiff knew regarding her injury did not induce mere suspicion that might have given rise to a duty to make an inquiry to confirm whether tortious conduct had occurred."

*Id.* at 128-29. Quoting from *Schiele v. Hobart Corporation,* 284 Or 483, 490, 587 P2d 1010 (1978), the court rejected the plaintiff's contention that " 'nothing short of a positive diagnosis by a physician' " will commence the limitations period because " '[a] plaintiff whose condition has not yet been diagnosed by a physician can have or, in the exercise of reasonable care, could have information which requires or would require a reasonably person to conclude' " that she had been injured by tortious conduct. 335 Or at 129. That rejection of the plaintiff's argument, similar to the contention made by plaintiff in this case, led the court to conclude that the plaintiff in *Greene* did not file her action until more than two years had elapsed from the date she reasonably should have discovered her injury.

Finally, even if the "substantial possibility" test applies to ORS 30.907, I disagree with the assertion that plaintiff had only a "mere suspicion" that defendants' products caused his lung disease. First, the majority improperly elevates the "substantial possibility" test under ORS 12.110(4) into the kind of standard that requires a particular degree of persuasive weight. The majority says that "a 'substantial possibility' connotes something less than a preponderance, but still a fairly high level of certainty[.]" 197 Or App at 461-62. Later, the majority explains:

"This is not a case of competing medical opinions. It is a case in which plaintiff's treating physicians consistently expressed uncertainty about the cause of his symptoms. As late as 1994, one of those doctors indicated that the etiology of his symptoms was uncertain. Two other possible causes for his symptoms—exhaust fumes and smoking—were identified. When confronted in 1995 with a report that

stated repeatedly that asbestos was not the cause of plaintiff's symptoms, his treating physicians concurred, which was consistent with their earlier and ongoing expressions of uncertainty about the cause of his disease. Given that record, we cannot say *as a matter of law* that plaintiff knew, or reasonably should have known, that there was a considerable likelihood that the cause of his disease was asbestos."

197 Or App at 466-67 (emphasis in original).

First, the word "likelihood" connotes that an assertion of fact is "more likely than not." *Webster's* defines a "likelihood" as a "probability" or as the "appearance of probable success," *id.* at 1310. Moreover, the *Gaston* court could have used the word "likelihood" in lieu of the word "possibility" to describe the test that it was creating, but it obviously chose not to. Rather, it contrasted the phrase "mere suspicion" with the phrase "substantial possibility" to describe the difference between when the limitations period under ORS 12.110(4) begins and when it does not commence. A "mere suspicion" expresses the possibility that an asserted fact exists but a mere suspicion is just that; there is a lack of evidence to support it. Such a possibility or suspicion becomes "substantial" when the possibility acquires "substance"; that is, when it is supported by evidence and constitutes more than mere conjecture.[10] Therefore, whether an asserted fact constitutes a "substantial possibility" does not depend on a "high level of certainty" as the majority asserts, or for that matter, any persuasive weight by itself. Rather, it depends on whether the possibility asserted has a sufficient factual basis that would prompt a reasonable person to conduct further inquiry.

Second, no reasonable trier of fact could find based on the ordinary meaning of the phrase that plaintiff had only a "mere suspicion" that defendants' products caused his disease, given plaintiff's consistent assertions to medical providers as to the cause of his disease, the evidence of his own physicians' opinions, and the allegations contained in the disability claims that he filed. Even the majority implicitly

---

[10] *Webster's* defines "substantial" as "something having substance or actual existence." *Id.* at 2280.

acknowledges that fact when it concedes that plaintiff's doctors presented him "with a number of equally plausible factual explanations" for his disease. 197 Or App at 466. Clearly, if an explanation given by a medical provider is "plausible," a reasonable plaintiff has more than a mere suspicion about the cause of a disease and the obligation to inquire further. In other words, plaintiff reasonably could not be characterized as being in the shoes of the plaintiff injured by medical malpractice who suspects that he has been injured by his medical provider but lacks any medical evidence to supports his conjecture.

For the above reasons, I dissent.

Ortega, J., joins in this dissent.